# **EXHIBIT 8**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

HERMAN HARRIS JR., ET AL.,

*Plaintiffs*,

and

UNITED STATES OF AMERICA,

*Plaintiff-Intervenor,*

v.

ST. JOHN THE BAPTIST PARISH
SCHOOL BOARD, ET AL.,

*Defendants.*

CONSOLIDATED WITH:

KATHY R. DUHON, ET AL.,

CIVIL ACTION NO.:

13,212  SECTION A

CONSOLIDATED WITH

CIVIL ACTION NO.:

90-cv-01669  SECTION A

HON. JAY C. ZAINEY

## DECLARATION OF JERRY ROSEMAN

JERRY ROSEMAN, acting in accordance with 28 U.S.C. §1746, 26(a)(2)(B), the Federal Rules

of Civil Procedure, and Rules 702 and 703, the Federal Rules of Evidence, does hereby declare

and say:

# I.   <u>**Introduction**</u>

1. My name is Jerry Roseman, Master of Environmental Science, and I am the principal investigator/president of Occupational Health Consultation Services, Inc ("OHCS, Inc.").

2. At OHCS, Inc. I provide consulting services to public and private entities in the field of: (1) environmental exposure assessment, evaluation, and science and (2) school building systems and facility conditions, with a focus on the assessment, evaluation, and testing of pre-kindergarten through 12th grade ("PK-12") public school facility conditions, including environmental hazards. My curriculum vitae is attached as Exhibit A. I am being compensated for my work in preparing this Declaration at the rate of $150 per hour. As of the date I signed this Declaration I have spent approximately 135 hours on this matter.

3. I have been retained by the NAACP Legal Defense & Educational Fund, Inc. ("LDF"), as counsel for Private Plaintiffs to provide my opinions about the relationship and adverse impacts associated with environmental hazardous air pollutants ("HAPs") on the air quality in PK-12 school facilities (the buildings, equipment, entrance areas, schoolyards and playgrounds) in general, and the adverse health and safety hazards and risks to students, faculty and staff and detrimental educational impacts at 5th Ward Elementary School (herein referred to as "5th Ward"), East John Preparatory Academy (herein referred to as "ESJPA") and at LaPlace ES, all located in St John the Baptist Parish, Louisiana.

4. My opinions are based upon information, documents, reports and other materials provided to me by counsel as well as numerous EPA and other government reports, data, and information, as well as sampling data and other information provided by LDEQ, and Denka related to chloroprene exposures from the Denka Performance Elastomer LLC (herein referred to as "Denka") facility. The opinions expressed are based on the data and information available to me at the time I prepared this declaration.  Specific materials, sources, and citations I relied on in forming my opinions are provided in footnotes throughout my report or in Attachment 2, References.

My opinions are also based on my general knowledge obtained through experience over the past 43 years of professional practice in the fields of environmental and occupational science and health and safety with a major focus (for at least 40 years) in assessment, evaluation, and monitoring activities associated with physical, chemical, biological, and other environmental hazards in PK-12 public school and other buildings.

As part of my normal and routine job duties and responsibilities I evaluate issues, adverse conditions, and other aspects of the as-built, school building facility environment, related to a wide range of occupational and environmental exposures posed to school building occupants, including staff and students. This includes, but is not limited to evaluation of chemical, physical, and biological exposures, impacting the school building and staff and students, regardless if the exposures originate outside or inside the building and grounds.

A major part of my work is to evaluate and assess sampling, monitoring, and health-based information and data related to hazardous chemical, physical and biological agents

5. The specific purposes of this declaration are:

    a. To show that environmental air quality ("EAQ") condition-related impacts, including those associated with HAP exposures to volatile organic compounds in and on a school's facilities are recognized and acknowledged to be important components of school building facility conditions that can pose serious risks to school students and staff exposed to these airborne toxins.

    b. To show that HAPs, including chloroprene, generated by exterior industrial sources, and in close proximity to, occupied school buildings such as is the situation existing at the 5th Ward in Louisiana's St. John the Baptist Parish School District present dangerous exposure and health risk to school occupants, especially to children under the age of 16.

    c. To provide a scientific and evidence-based assessment and review specifically focused on the range of potentially harmful HAP VOC exposures impacting the health, safety, and welfare, as well as educational and academic achievement of students.

    d. To draw upon my specialized experience and knowledge in the fields of environmental science, health, and safety and PK-12 school facility conditions, to describe and explain the adverse impacts of HAP exposures on school students including the acute and chronic health and safety risks as well as short and long-term adverse educational outcomes associated with the exposure risk.

    e. To compare exposure risks and related chloroprene hazard to staff and students in the as-built school environments at 5th Ward, ESJPA, and LaPlace ES.

6. The United States Environmental Protection Agency ("EPA") uses the term "hazardous air pollutants," also called "toxic air pollutants" or "air toxics" to describe a list of one hundred eighty-eight (188) specifically regulated substances that includes pollutants known or suspected to cause cancer, mutations, and other serious health effects, such as damage to the reproductive system or birth defects, and other adverse health/medical symptoms and illness. Under the Clean Air Act ("CAA"), EPA is required to regulate emissions of HAPs; the original CAA list included 189 pollutants. Since 1990, EPA modified the list through rulemaking to now include 188 specifically designated HAPs, one of which is chloroprene,

the air pollutant emitted by the Denka industrial facility and property located on the boundary of U.S. Census Tracts ("Census Tract") 708 and 709 in Louisiana.[1]

7. There are different types, or categories, of chemicals included in the EPA list of HAPs.  Some HAPs are metals like lead, mercury and arsenic that exist in forms that can get into the air and can be inhaled.  Other HAPs are airborne particles or fibers like asbestos. Still others, such as chloroprene, a major cancer-causing HAP of concern impacting the health, safety, and welfare of students, staff and communities in and around 5th Ward, are EPA-regulated HAPs or toxic air pollutants that fall into the category referred to as Volatile Organic Compounds ("VOCs").

VOCs are chemicals existing as liquids or solids under conditions of normal temperature and pressure, but that can evaporate releasing a vapor (similar to a gas) that can be dispersed through the air and can be inhaled by those nearby.  Common VOCs include gasoline (in a liquid form that easily and quickly evaporates in air posing an airborne exposure risk) and acetone, the major ingredient in nail polish remover, whose liquid form evaporates, like other VOCs, to generate an airborne vapor that can be inhaled resulting in adverse health effects.

8. Chloroprene is a colorless, flammable, and hazardous liquid VOC used to make a synthetic rubber commonly known as neoprene. At temperatures below 139 degrees Fahrenheit and at normal atmospheric pressure, chloroprene is a liquid. However, it is highly volatile and is emitted into the air as a vapor from various industrial processes and storage facilities at the Denka Facility resulting in airborne concentrations of chloroprene released into the air posing a respiratory hazard. Once inhaled, chloroprene causes a range of adverse health impacts, including cancer to exposed populations, especially to children.

9. The EPA advises that short term symptoms from chloroprene exposure include headaches, dizziness, irritability, and rapid heart rate.  Long-term exposure is associated with breathing problems and neurological system impacts and, according to the EPA, "breathing chloroprene increases the risk of developing cancers, such as lung and liver cancer, over the course of a lifetime. Chloroprene acts via a mutagenic "mode of action" meaning that when a person breathes chloroprene, it causes mutations in the body's cells. These mutations increase the likelihood that a person who breathes chloroprene will develop certain cancers over the course of their lifetime."  EPA also concluded that children "accumulate excess lifetime cancer risk to chloroprene faster than adults."

10. Children do not react like adults when exposed to environmental chemicals for several  well-documented reasons:

---

[1] Based on review of images using Google Maps and Google Earth and details provided in EPA reporting and descriptions

4

a. Infants and young children breathe faster than adults, leading to greater inhalation of airborne pollutants like chloroprene relative to their body size. This increased exposure heightens their risk of adverse health effects.

b. Children's organs and systems, including their lungs, liver, and kidneys, are still developing. This immaturity means they are less efficient at detoxifying and excreting harmful chemicals, leading to greater vulnerability to toxins.

c. During early growth phases, children's cells divide more rapidly than adults'. This rapid cell division increases the likelihood of genetic mutations when exposed to mutagenic chemicals like chloroprene, leading to a higher cancer risk.

d. Children's skin is more permeable than that of adults, which means they can absorb chemicals more easily through dermal exposure. This can contribute to their overall exposure burden.

e. Children often play close to the ground, where chloroprene and other heavier-than-air chemicals can settle. This behavior results in higher exposure levels compared to adults who spend more time standing or sitting higher off the ground.

f. Children's bodies require more energy and nutrients for growth, leading to a higher metabolic rate. This elevated metabolism can enhance the uptake and distribution of hazardous chemicals within their bodies.

g. Exposure to hazardous chemicals during critical windows of development (such as prenatal, infancy, and early childhood) can cause irreversible damage to developing organs and systems, leading to long-term health consequences.

h. Children's immune systems are not fully developed, making them less capable of defending against the toxic effects of chemicals and more susceptible to developing diseases as a result of exposure.

11. Starting in 2005 the U.S. EPA published several reports and guides that defined a set of age groupings to be used for risk assessment that take into account the unique, elevated and special risks of chemical hazard exposure to children (Table 1, below, is from the U.S. EPA's "Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to

Environmental Contaminants."[2] EPA published additional documents addressing risk assessment in children.[3][4][5][6][7]

12. EPA's supplemental guidance concluded that "cancer risks" are generally higher from early life exposure, than from similar levels of exposure later in life, especially for mutagenic carcinogens (such as chloroprene).  The guidance recommends the use of age-dependent adjustment factors ("ADAF"s):

    a.  For exposures before 2 years of age, a 10-fold adjustment; and
    b.  For exposures between 2 and < 16 years of age, a 3-fold adjustment.

In other words, if there are chloroprene exposure concentrations of 0.3 µg/m³, for example, that impact children under the age of 2 years old their "effective" exposure for the purposes of risk and harm from cancer would be multiplied by 10 times – as if they were actually being exposed to a level of 3.0; similarly for children between the ages of 2-16, the "effective" exposure for the purposes of risk and harm from cancer would by multiplied by 3 times – as if they were exposed to 0.9 µg/m³.  Their cancer risk would also be elevated accordingly.

The under age 2 children, would be assumed to have a cancer risk related to an exposure at 3.0 µg/m³ which would equal a cancer risk of 15-in-10,000 **(15 times the EPA maximum upper bound level for safety);** and for children ages 2-16 their cancer risk would be **4.5 times the EPA maximum upper bound level for safety.**

13. According to extensive EPA data and information, starting in 2011 from the National Air Toxics Assessment (NATA)/AirToxScreen, for people in Census Tract 708, which includes 5th Ward and the Denka facility "the risk of developing cancer was significantly higher than the national average (the census tract was, in fact, the worst in the United States for cancer

---

[2] U.S. EPA. Washington, DC: U.S. EPA; 2005a. Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to Environmental Contaminants. EPA/630/P-03/003F. https://www.epa.gov/sites/production/files/2013-09/documents/agegroups.pdf
[3] U.S. EPA. Washington, DC: U.S. EPA; 2005c. Supplemental Guidance for Assessing Susceptibility from Early-life Exposure to Carcinogens. 630-R-03-003F. https://epa-prgs.ornl.gov/chemicals/help/documents/CHILDRENS_SUPPLEMENT_FINAL_%5b1%5d.pdf
[4] U.S. EPA. Washington, DC: U.S. EPA; 2005b. Guidelines for Carcinogen Risk Assessment. 630/P-03/001F https://www.epa.gov/sites/production/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf
[5] U.S. EPA. Washington, DC: U.S. EPA; 2005c. Supplemental Guidance for Assessing Susceptibility from Early-life Exposure to Carcinogens. 630-R-03-003F. https://epa-prgs.ornl.gov/chemicals/help/documents/CHILDRENS_SUPPLEMENT_FINAL_%5b1%5d.pdf
[6] U.S. EPA. Child-Specific Exposure Factors Handbook. EPA/600/R-06/096F. 2008a https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=199243
[7] U.S. EPA. Washington, DC: U.S. EPA; 2011a. Exposure Factors Handbook 2011 Edition (Final). EPA/600/R-09/052F https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=236252

risk); more than 90% of that increased risk was due to chloroprene exposure; and the increased risk was attributable to Denka's chloroprene emissions."

14. The 2018 World Health Organization (WHO) report titled, "Air Pollution and Child Health"[8] clearly documents the dangerous impacts of hazardous environmental pollutants, such as chloroprene, and presents a clear and unambiguous conclusion:

> The World Health Organization (WHO) concluded, ***"the evidence is clear: air pollution has a devastating impact on children's health."*** According to the WHO: "a child who is exposed to unsafe levels of air pollution early in life can thus suffer a "life sentence" of illness." WHO concludes that: "strong action to reduce exposure to air pollution offers an unparalleled opportunity to protect the health of children everywhere."

15. A paper titled, "Indoor Air Quality and Health In Schools: A Critical Review of Developing the Roadmap for The Future School Environment, Journal of Building Engineering, Vo. 57, 1 October 2022, addresses concerns related to exposures from volatile organic compounds ("VOCs") like chloroprene by highlighting that "children breathe in more air per unit weight and are more sensitive to heat/cold and moisture. Thus, their vulnerability is higher than adults, and poor conditions may affect proper development." Additionally, the authors concluded that, "VOC pollutants are among the leading indoor air pollutants causing severe health issues for children and adults" and that "exposure to various air pollutants in school buildings risks severe damage to pupils' health since they inhale a larger volume of air corresponding to their body weights than do adults."

16. The EPA uses the 1-in-1 million (1-in-1,000,000) cancer risk level as a benchmark to indicate what is considered to be an effectively safe level of cancer risk from exposure to HAPs. This benchmark is intended to protect public health by keeping any additional cancer risk from environmental exposures to level below which risk from lifetime exposure would be "negligible".

    a. It is essential to understand the difference between the EPA benchmark level considered "safe" and a maximum upper bound level of risk sometimes allowed by regulatory bodies like the EPA while additional and more protective controls are implemented. The EPA defines a "safe" level of exposure as one that corresponds to a 1-in-1 million cancer risk. ***For chloroprene, the concentration in air corresponding to a safe level of chloroprene re: cancer risk, is 0.002 micrograms per cubic meter (μg/m³).***

---

[8] World Health Organization, Department of Public Health, Environmental & Social Determinants of Health, Climate and Other Determinants of Health Cluster; *Air Pollution and Child Health: Prescribing Clean Air, Summary, 2018*

b. In some cases, including that of chloroprene, the EPA enforces a maximum individual risk level ("MIR"). According to the EPA, "An MIR represents the highest estimated risk to an exposed individual in areas that people are believed to occupy"[9]; what this means is that even where the EPA understands that the safe level of exposure may be 0.002 μg/m³ such is the case with chloroprene, they will allow, temporarily, a more elevated standard to be used, while the polluter is installing additional controls. This upper bound MIR for chloroprene is 0.2 μg/m³ which equals excess lifetime cancer risk of 1-in-10,000 a level that is 100x higher than the safe level, and is therefore 100 times more dangerous.

c. The current regulatory level, also can be referred to as an "acceptable" risk level - 1/10,000 (0.2 μg/m³ for chloroprene) by the EPA is a compromise between the much stricter 1-in-1 million level that provides maximum public health protection.

d. In May 2016, the EPA's Air Toxics Program published a memo titled "Preliminary Risk-Based Concentration Value for Chloroprene in Ambient Air"[10] in which is wrote:

> "It is preferable to have the chloroprene concentrations at the highest modeled census block as close to 0.002 μg/m3 as reasonably achievable."
>
> "At a minimum, we recommend that this facility aims for emission reductions such that the maximum annual average chloroprene concentration is no higher than 0.2 μg/m3 at the highest modeled off-site location. That being said, it is preferable to have the chloroprene concentrations at the highest modeled census block as close to 0.002 μg/m³ as reasonably achievable."

In other words, although EPA accepts 0.2 μg/m3 as an upper bound MIR it clearly recognizes that the level that should be used to ensure that a lifetime exposure will not involve a measurable risk of excess cancer is 0.002 μg/m3, a safe level that is 100 x less than the maximum upper bound MIR of 0.2 μg/m3.

17. The following is a summary of my opinions in this matter:

a. Given the extensive record related to documented chloroprene emissions and hazardous air pollution levels from chloroprene and related cancer risk, in addition to other health impacts to the population in census tracts 708 and 709 particularly, and especially to students and staff at 5th Ward and ESPJA, the only reasonable

---

[9] EPA, Report to Congress 1999, p. 45, EPA-453/R-99-001
[10] Letter from Kelly Rimer, Leader, Air Toxics Assessment Group, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, U.S. EPA to Frances Verhalen, P.E., Chief, Air Monitoring Grants Section, EPA Region 6, Preliminary Risk-Based Concentration Value for Chloroprene in Ambient Air (May 5, 2016).

course of action that aligns with the best interests of the children's health and safety is the immediate closure of the school and relocation of the students and staff to a school in which environmental exposures to chloroprene and other cancer-causing chemicals are absent (i.e. presenting a less than a 1-in-1 million risk of developing cancer over a 70-year lifetime of exposure to identified HAPs); based on information provided, and my analysis, LaPlace ES seems to be the best currently available option.

b.  The continuation of school operations under the current conditions at 5th Ward, would continue to place the most vulnerable members of the population – the elementary school children, as well as children living in Census Tracts 708 and 709 at an unacceptable risk of harm. The facility conditions at 5th Ward are objectively inferior and unsafe because of airborne exposures to chloroprene posing unacceptable cancer risk; the only reasonable course of action is relocation to a school where there is no measurable chloroprene exposure.

c.  Based on the ongoing and continuously elevated levels of chloroprene, and associated cancer risk, especially to young children (i.e. under the age at 16) in census tracts 708, 709, and 711, including students and staff at ESJPA, which is within 1 mile of a major chloroprene emission source (Denka), **ESJPA is not a safe and suitable location for placing 5th Ward students and staff.**

d.  Census Tract 708 has the highest rate of environmental cancer related to air pollution in the country with the largest contribution to that cancer rate from chloroprene exposures – the levels of chloroprene exposure and the specific cancer risks, especially to children under the age of 16, presents an unacceptable exposure risk to chloroprene for 5th Ward students and staff to be in the building and on the grounds of the school.

e.  Relocating 5th Ward students and staff to LaPlace ES is recommended as the only suitable available option, in comparison to ESJPA or 5th Ward, for several reasons related to airborne chloroprene exposures posing cancer and other environmental hazard risk to, in and around the 5th Ward  and ESJPA facilities:

    i.   Both 5th Ward and ESJPA are very close to the Denka plant site and fence line and therefore subjected to significant chloroprene concentrations above the 0.2 µg/m3 level (LaPlace ES is approximately 4-5 times further from Denka than 5th Ward is, and more than twice as far from Denka as ESJPA is).

    ii.  Multiple records and reports all relying upon, and reporting the same chloroprene exposure and concentration data, based on the extensive EPA and Denka air monitoring programs and results from environmental sampling starting at least as early as 2016 and continuing through 2023, document ongoing and continuing exposures to hazardous chloroprene levels in excess of 0.2 µg/m3; the locations closest to Denka and/or in the

prevailing wind direction from Denka, which includes 5th Ward and ESJPA, exhibit significantly elevated concentrations of chloroprene compared to locations farther away and not in the direction of generally prevailing winds (e.g. LaPlace ES).

iii. Chloroprene sampling data reported by the EPA and Denka, prevailing wind direction that indicates main prevailing winds are much more frequently in the direction of 5th Ward and ESJPA than toward LaPlace ES (Wind Rose graphics Figures A-D describing prevailing wind direction), Gaussian Plume Modeling (Figure E), used to summarize the relationship between the distance of an HAP emission source to a potentially impacted location (i.e. increasing distance from a source to a defined location results in decreased concentrations at the location) when considered together lead to the clear conclusion that it would be unsafe to have students and staff at either 5th Ward or ESJPA.

iv. Sampling results, including those from the time period 2020-2023 (well after improved control technologies were implemented at Denka in 2018), continues to document hazardous levels of chloroprene exposure in the environment at, and nearby, 5th Ward and ESJPA, with average and short term/peak chloroprene levels routinely measured to be 5 to 25 times higher than the currently used 0.2 µg/m3 EPA chloroprene Maximum Upper Bound- MIR.

f. The risk associated with the elevated levels of HAPs in the immediate proximity of 5th Ward's outdoor facilities (e.g. its schoolyard, playground, and entrance areas), and the knowledge that such exposures pose dangerous health risks to the student occupants in the school, are of serious concern as are the consequential impacts on occupant health, safety, welfare, and comfort. The hazard, as a practical matter, is further exacerbated by the situation at 5th Ward where there is not a gymnasium inside the school building requiring outside play and exercise, a necessary and integral part of the school day, particularly for elementary school students; these dangers should be addressed urgently by immediately relocating the students and staff away from 5th Ward.

g. Chloroprene concentrations as measured by EPA, the Louisiana Department of Environmental Quality ("LDEQ"), and Denka, clearly document that even following the installation and use of required pollution controls for chloroprene by Denka, cancer risk levels well in excess of the 1-in-1 million (equivalent to 1-in-10,000) maximum upper bound MIR, have persisted in census tracts near the Denka facility.

h. Inclusive of, and taking into account, the various types of monitoring programs and sampling methods used, the chloroprene concentrations measured – both average and short term/peaks/spikes - by EPA, LDEQ, and Denka, since March 2018, especially in the census tracts around and closest to the Denka facility have

consistently documented chloroprene concentrations above 0.2 µg/m3; ***this has been the case even during the month of September, 2021 when Denka's chloroprene production was shut down due to Hurricane Ida.***

## II.   **Analysis**

### A.  **Defining School Facilities & Conditions**

18. Two (2) inextricably related elements comprise school facilities: (1) the physical infrastructure that houses the educational activities of a school (including the buildings, schoolyards, playgrounds, and entrance areas);  and (2) the supporting building systems and equipment such as roofs, windows, plumbing, and heating, ventilation and air conditioning ("HVAC") that provide mechanical services to the constructed school building and its occupants to help ensure the building's functionality, health, and safety.

19. Inadequate facility conditions include not only structural defects, but also deficient and dangerous environmental conditions that the facility fails to address, such as ambient air pollution or lead in drinking water from the municipal system or from conditions inside the facility. Good air quality includes thermal comfort, humidity control and sufficient fresh air, filtered as necessary.

20. Failure to resolve deleterious environmental conditions is recognized as a facility condition deficiency.  Such deleterious conditions may originate outside the school building, for example from industrial pollution sources, sewer gases that may infiltrate the building, carbon monoxide and exhaust gases from idling buses and vehicles located outside of the building, conditions that occur inside the school but which are directly related to dampness and flooding events that originate outside the building, and other deficient exterior outdoor environmental sources and conditions, including insect and rodent infestations originating from outside the building.

21. All of these adverse conditions and issues, whether they originate outside or inside the school, are intimately and inextricably related to the school building as a "facility" in which students and staff learn and work, and for which school facility maintenance and operational management are responsible.[11] [12] [13]

---

[11] EPA, "IAQ Tools for Schools: Why Indoor Air Quality is Important to Schools" (https://www.epa.gov/iaq-schools/why-indoor-air-quality-important-schools)

[12] Occupational Safety & Health Administration ("OSHA") Indoor Air Quality- Schools (https://www.osha.gov/indoor-air-quality/schools)

[13] American Society of Heating, Refrigeration & Air Conditioning Engineers ("ASHRAE") "Design Guidance for Education Facilities: Prioritization for Advanced Indoor Air Quality"  2023

22. The American Lung Association's ("ALA") Indoor Air Quality in Schools Guide[14] advises that there are a number of variables related to facility infrastructure and system issues including:

    a. Indoor/Outdoor air pollutants
    b. Poor air filtration
    c. Poor air flow
    d. Improper room/space pressurization/ventilation
    e. Temperature
    f. High or low humidity

The ALA Guide highlights the particular risk to children, such as those attending 5th Ward: "Children's bodies and lungs are still developing — children breathe 2-3 times more often than adults. Because of this, their lungs may be more at risk to environmental exposures than those of adults."[15]

23. Polluted outdoor air enters buildings in three (3) main ways: by infiltration, natural ventilation, and mechanical ventilation.

    a. In the process of "infiltration," outdoor air flows into buildings through openings not intended to serve as air inflow points, such as openings, holes, joints, cracks in walls, floors, and ceilings, and around windows and doors. This process allows "unfiltered" air from outside a building into building spaces.

    b. Natural ventilation refers to the process where air moves into building spaces through opened windows and doors to allow for outside air to enter a building.

    c. Mechanical ventilation systems and components cover a wide variety of devices and equipment that comprise the typical heating, ventilation and air conditioning systems found in many buildings. These systems include fans, ductwork, filters, and air supply registers to distribute air throughout the building.

Infiltration and natural ventilation are affected by air temperature differences between indoor and outdoor environments and by wind direction and speed. The number of openings in the building is also critical.

24. All three (3) processes, typically found together in many school buildings, may be critical contributors to the increase in hazardous air pollutant levels inside the building; properly controlled and regulated, they can work to help minimize the levels of airborne pollutant entry and concentration in the building.

---

[14] https://www.lung.org/getmedia/14c45699-8055-4cdc-8695-7a57ae36058a/ALA-IAQ-School-V2.pdf
[15] American Lung Association Website - https://www.lung.org/clean-air/at-school/iaq-guide#:~:text=Research%20has%20shown%20indoor%20air,comparison%2C%20and%20reading%20and%20comprehension&text=Reduce%20absenteeism%20due%20to%20lung%20diseases%20such%20as%20asthma

25. In 2009, as part of a new air toxics monitoring initiative, EPA and state and local air pollution control agencies monitored the outdoor air around schools for toxic air pollutants.[16]

## B. Cancer Risk to Children

26. In 1986 and in 2005 the EPA published guidelines for cancer risk assessment (U.S. EPA. 1986. Guidelines for Carcinogen Risk Assessment. 51 FR 33992-34003; U.S. EPA. 2005. Guidelines for Carcinogen Risk Assessment. 70 FR 17765-17817; and U.S. EPA. 2005. Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens, EPA/630R-03/003F[17]

In the referenced documents, EPA concluded that "children can be more susceptible to many carcinogenic agents" than are adults and that the lifetime risk of developing cancer when exposed to a carcinogenic HAP as a young child can be significantly greater than the lifetime risk of developing cancer if exposure to a carcinogenic HAP when an adult.  Children can, in fact, also develop cancers in different organs than adults would from the same exposure

27. According to the NCI-NIH 2008-2009 Annual Report on Reducing Environmental Cancer Risk, 2010 "Children are at special risk for cancer due to environment contaminants and should be protected.  Opportunities for eliminating or minimizing cancer-causing and cancer-promoting environmental exposures must be acted upon to protect all Americans, but especially children.  They are at special risk due to their smaller body mass and rapid physical development, both of which magnify their vulnerability to known or suspected carcinogens. It is vitally important to recognize that children are far more susceptible to damage from environmental carcinogens and endocrine-disruptors than adults." [18]

28. Children are particularly vulnerable to the health consequences of toxic air pollution. 5th Ward, is located three blocks from Denka. EPA's 2014 National Air Toxics Assessment concluded that **census tract 708 residents face a cancer risk as high as 1,505-in-1 million—the highest cancer risk in the nation from air pollution.**

29. EPA uses its Integrated Risk Information System ("IRIS") to assess and characterize the hazards to human health, including cancer hazard, posed by environmental chemicals. To develop an IRIS assessment for a particular chemical, the EPA determines population-specific exposure conditions and concentrations in order to derive toxicity values; IRIS toxicity values for cancer from inhalation exposure are called inhalation unit risk ("IURs")

---

[16] Assessing Outdoor Air Near Schools.
https://www3.epa.gov/air/sat/#:~:text=School%20Environments%20In%202009%2C%20as,of%20187%20of%20these%20pollutants
[17] Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens, EPA/630R-03/003F (https://www.epa.gov/sites/default/files/2013-09/documents/childrens_supplement_final.pdf)
[18] NCI-NIH 2008-2009 Annual Report on Reducing Environmental Cancer Risk, 2010
https://deainfo.nci.nih.gov/advisory/pcp/annualreports/pcp08-09rpt/pcp_report_08-09_508.pdf

which represent estimates of the increased cancer risk from inhalation exposure to HAPs. The IUR is multiplied by an estimate of lifetime exposure (in μg/m3) to estimate the lifetime cancer risk in general and for specific and more vulnerable groups, such as children.

30. As described above (in paragraph 12) the Age Dependent Adjustment Factor calculation applied to chloroprene exposures document **unacceptable lifetime cancer risks**, to children at exposure levels below the maximum/upper bound MIR chloroprene exposure level of 0.2 μg/m3.

    a.   The upper bound MIR limit of 0.2 μg/m3 corresponds to a lifetime cancer risk of 100-in-1 million, which well in excess of the EPA safe level (1-in-1 million).

    b.   If children from birth to age 2 are exposed however, whatever chemical concentration they are exposed to must be adjusted "upward" by a factor of 10; accordingly, exposure to the chloroprene maximum/upper bound level of 0.2 μg/m3 exposes such a child to an effective IUR of 0.2 x 10 = 2.0 μg/m3 with a related lifetime cancer risk of 1,000-in-1 million which is clearly unacceptable. Another way to look at the same situation would be to say that in order for even the maximum/upper bound level of 0.2 μg/m3 to be effectively applied to chloroprene exposure to children < 2 years of age, the average maximum/upper bound level to which they could be exposed would be 0.02 μg/m3 **(as the risk to these children is 10 times the risk to persons over 16 years of age, the acceptable exposure concentration must be reduced by that same factor)**.

    c.   For children in the age range of 2 – 16 years, the exact same approach would be applied but instead of an increased cancer risk factor of 10, the cancer risk factor to be used would be 3. Based on this, the average maximum/upper bound level to which they could be exposed would be about 0.066 μg/m3 (a 3-fold **reduction** to account for the 3-fold increased risk).

    d.   The combined ADAF for children, up to the age of 16, using the EPA's IRIS IUR approach, is calculated to be "5", meaning that children exposed to specific concentrations of chloroprene between birth and age 16 are effectively exposed to levels 5 times higher thus the risk to children is 5 times greater than that of adults and therefore the maximum/upper bound level of to which they would be permitted to be exposed would be 0.04 μg/m3.

### C.  Summary of HAP-Related Impacts to 5th Ward Students & Staff

31. 5th Ward is located in Reserve, Louisiana, in an area known as "Cancer Alley" due to the high concentration of chemical plants that handle, manufacture, and release cancer-causing chemicals into the air. According to the state emissions inventory, more than 200 industrial facilities release significant amounts (i.e. >5 tons per year) of harmful air pollution. 5th Ward is uniquely situated in very close proximity to industrial sources emitting highly toxic air pollutants especially including the cancer-causing VOC, chloroprene, emitted by the Denka industrial facility.

32. According to the 2022 letter/article titled, "Air pollution is linked to higher cancer rates among black or impoverished communities in Louisiana"[19]

> "In absolute terms, more pounds of industrial toxic air pollution are released annually in Louisiana than in any other state, based on 2019 data from the US Environmental Protection Agency (EPA)."

> "Nearly every census tract between Baton Rouge and New Orleans ranks in the top 5% nationally for cancer risk from toxic air pollution and in the top 10% for respiratory hazards."

> "While cancer risk from air toxics is uniformly high across Louisiana's Industrial Corridor by national rankings, this burden is unevenly distributed among neighborhoods. Recent estimates of pollution-related cancer risk for census tracts from Baton Rouge to New Orleans range from 24.8 per million (Tract 279.02, Jefferson Parish) to 1505.1 per million (Census Tract 708, St John the Baptist Parish), with Black and impoverished tracts being disproportionately impacted."

An important conclusion:

> "Our study provides evidence that toxic air pollution is a significant driver of cancer rates in Louisiana's most vulnerable communities. We found no evidence that the parish-wide smoking or obesity rates contributed to the observed link between estimated cancer risk from air toxics and cancer incidence."

*In other words, although the study authors acknowledged that other factors contribute to overall cancer incidence, they found that the cancer risk in the study areas, including Census Tract 708, from toxic chemicals like chloroprene, is in excess of the risk from other exposures and conditions, such as smoking or obesity, and concluded: "higher levels of toxic air pollution were associated with higher cancer incidence."*

33. It is known that all chloroprene exposures pose cancer risks, those risks can be predicted, and the risks increase with increasing exposure. This is true for all mutagenic carcinogens. As stated by the National Academies, "[f]or carcinogens, it has generally been assumed that there is no threshold of effect." In other words, **all** exposure concentrations pose some risk and children are at greatest risk.[20]

---

[19] Kimberly A Terrell and Gianna St Julien 2022 *Environ. Res. Lett.* 17 014033
[20] NRC 2006 pp. 6, 245; 2009 p.6, 118; EPA 2005a, p. 1-11, NIOSH 2016 pp. vi, 20, WHO 2020 pp. 5-43)

34. With respect to the specific situation and circumstances for the elementary school children living in Census Tract 708 the following facts are summarized below regarding the alarming and elevated lifelong cancer risks posed:

   a. EPA's 2011 National Air Toxics Assessments ("2011 NATA") showed cancer risks as high as 826-in-1 million in the Census Tract (708) of the Denka facility (more than 8 times the maximum/upper bound of acceptability for estimated excess cancer risk over a 70-year lifetime). The risk of developing cancer was significantly higher than the national average (the Census Tract was, in fact, the worst in the United States for cancer risk). More than 90% of that increased risk was due to chloroprene exposure; and the increased risk was attributable to Denka's chloroprene emissions.

   b. The most recent NATA, based on data from 2014 and released in 2018, found that cancer risks in this community are as high as 1,505-in-1 million —the highest cancer risk in the nation from air pollution.

   c. In addition to the 2014 NATA, documenting excess cancer risk to be 1505-in-1 million (more than 15 ties the upper bound of acceptability for excess estimated cancer risk) in Census Tract 708, EPA found Census Tract 709 to have 620-in-1 million cancer risk (more than 6 times the upper bound of acceptability for excess estimated cancer risk) and Census Tract 707 to have a 510-in-1 million (more than 5 times the upper bound of acceptability for excess estimated cancer risk)

   d. EPA's 2014 National Air Toxics Assessment found that residents in Census Tract 708, which is located in St. John the Baptist Parish and next to Denka, face a cancer risk 47 times the national average.

   > According to the EPA **chloroprene emissions from Denka accounts for approximately 85% of the cancer risk in Census Tract 708**
   > "An additional 12% of the cancer risk posed is related to ethylene oxide - another recognized cancer-causing HAP which is also released into the air by Denka, as well as by Air Products."

35. On May 5, 2016, a memo from the EPA's Kelly Rimer titled "Preliminary Risk-Based Concentration Value for Chloroprene in Ambient Air" highlighted the following main points:

   a. "Under EPA's air toxics risk management framework, a cancer risk of 100-in-1-million is generally described as the upper limit of acceptability for purposes of risk-based decisions. ***Cancer at or below 1-in-1 million indicated little potential for cancer risk in the air toxics program" <emphasis added>.***

   b. "When existing source emissions are too high to achieve the 1-in-1 million level and controls are being considered, EPA is interested in controls that reduce off-site exposure concentrations associated with cancer risks to no higher that approximately 1-in-1 million for as much of the nearby population as feasible."

   > "One hundred in one million (100-in-1million) generally represents the upper bound of acceptability for estimated excess cancer risk over a 70-year lifetime. Specifically, residents of neighborhoods surrounding the Denka facility were routinely exposed to chloroprene concentrations that placed them at greater than an estimated 100-in-1 million risk of developing chloroprene-linked cancers over a 70-year lifetime."

c. "At a minimum, we recommend that this facility aims for emission reductions such that the maximum annual average chloroprene concentration is no higher than 0.2 µg/m3 at the highest modeled off-site location. That being said, it is preferable to have the chloroprene concentrations at the highest modeled census block as close to 0.002 µg/m3 as reasonably achievable." In other words, although EPA accepts 0.2 as a maximum allowable exposure, it clearly recognizes that the level should be 100 x less – set at 0.002 µg/m3 – the benchmark level for public health safety used by EPA as well as other agencies, including the U.S. CDC National Institute for Occupational Safety & Health ("NIOSH").

36. As reported in the EPA 2022 10 12 Final Letter LDEQ[21], "Cancer risks from air toxics in the St. John the Baptist Parish and in particular the Census Tracts located nearest the Denka facility declined after the AOC pollution control measures were installed but remain high. Tract 708 had a lifetime cancer risk of 400-in-1-million (four times the upper bound MIR of acceptability for estimated excess cancer risk over a 70-year lifetime), and tracts 707 and 709 both had estimated lifetime cancer risks of 200-in-1-million (two times the upper bound of acceptability for estimated excess cancer risk over a 70-year lifetime)."

37. The EPA maximum upper bound MIR level of  0.2 µg/m³ (100-in-1 million excess cancer risk level) **is not** based on *adequately* protecting the health, safety and welfare of children at 5th Ward; instead, as the EPA clearly stated (and as included in paragraphs 16a-d) it only reflects the maximum upper bound-MIR of *acceptability* for exposure to chloroprene while controls are being put in place to, ideally, lower cancer risk to the 1 in 1million level generally recognized as "safe."

38. As of September 2020, measured chloroprene air short term/peak concentrations (as determined by EPA continuous monitoring) remained as high as 16.0 µg/m³, a level that is *80 times greater than* the level of 0.2 µg/m3, established by the EPA as the maximum allowable concentration accepted until the existing industrial emission source can further reduce exposures.

---

[21] U.S. EPA, 2022 10 12 Final Letter LDEQ LDH 01R-22-R6, 02R-22-R6, 04R-22-R6.pdf (accessed here: https://www.epa.gov/system/files/documents/2022-10/2022%2010%2012%20Final%20Letter%20LDEQ%20LDH%2001R-22-R6,%2002R-22-R6,%2004R-22-R6.pdf

39. Regarding chloroprene exposures at 5th Ward, as well as at many other locations monitored by EPA and others as we have seen, even the maximum upper bound MIR level 0.2 μg/m³ is routinely exceeded by significant amounts.

40. Applying a 0.002 μg/m³ (1-in-1 million cancer risk) standard, the level considered to be unlikely to result in excess cancer risk in exposed children, we can see that the 16 μg/m³ concentration measured is actually ***8,000 times higher*** than what is considered safe.

41. According to the EPA in Louisiana – LaPlace, Louisiana – Frequent Questions[22]  and the EPA factsheet on chloroprene[23], in addition to causing cancer, chloroprene exposure also has the ability to cause headaches, irritability, dizziness, nausea, rapid heartbeat, trouble sleeping, fatigue, and respiratory problems.

42. According to data provided by the St. John the Baptist Parish School Board (Student Assignment Report, Spring 2024) 5th Ward has the following demographic breakdown: 334 total students of which 258 students were listed as "African American"; 56 were listed as "Hispanic"; 17 students were listed as "White"; 2 students were listed "Asian"; and 1 student was listed as Native American/Hawaiian/Pacific Islander.[24]

43. Chloroprene is one of the primary HAPs that has been extensively evaluated by the EPA in St John the Baptist Parish. EPA, as well as the Louisiana Department of Environmental Quality ("LDEQ"), and Denka have collected air samples to assess chloroprene concentrations in air for at least the past 9 years (since 2016). Evaluation and assessment work has also been done by the St. John the Baptist Parish Chloroprene Monitoring Demonstration, Cancer Risk in St John Parish ("CRISP") by the Louisiana State University, School of Public Health's Cancer Prevention & Control Program.

Chloroprene is a volatile organic compound that is also regulated and cited by OSHA, NIOSH, IARC, and other regulatory agencies as a cancer causing chemical and as a mutagen. In addition to cancer and other long-term health risks, short-term exposure can lead to acute respiratory issues, headaches, and increased blood pressure, which would significantly impair a student's ability to concentrate and learn effectively.

Extensive documentation specifically related to chloroprene sampling and exposure levels is provided in the above-referenced 10/12/2022 EPA Letter of Concern.  Particularly relevant details re: levels measured around the 5th Ward are summarized below:

  a. "Since March 2016, there has been a combination of discrete and continuous community-based and fence-line monitoring near Denka." Monitoring was done

---

[22] EPA in Louisiana - LaPlace, Louisiana - Frequent Questions https://www.epa.gov/la/laplace-louisiana-frequent-questions
[23] EPA factsheet on chloroprene https://www.epa.gov/sites/default/files/2016-10/documents/chloroprene.pdf
[24] ST. JOHN THE BAPTIST PARISH SCHOOL BOARD, Student Assignment Report Spring 2024

jointly by EPA, LDEQ, and Denka from March 2016 through August of 2022. (pg. 25).

b. According to the EPA report, chloroprene levels in air "consistently measure ambient chloroprene concentrations above 0.2 µg/m3, and average concentrations at all monitors are above 0.2 µg/m³ (these concentrations are above what the EPA considers safe and acceptable). (pg. 25).

c. Michael S. Regan, Administrator of the USEPA, wrote on January 24, 2022 letter to Toshio Imai, President and CEO of Denka and Edward D. Breen, Executive Chairman of DuPont, as follows:

> Based on summa canister air sampling conducted by the U.S. Environmental Protection Agency from October 2, 2019, to September 26, 2020, the annual average for chloroprene was 1.2 µg/m3 at the Fifth Ward Elementary School, including some shorter term (24-hour average) spikes as high as 15.3 µg/m³

d. In the EPA's "Letter of Concern" (EPA Complaint Nos. 01R-22-R6, 02R-22-R6, and) 04R-22-R6, dated 10/12/2022 (10 months after Mr. Regan's letter referenced above) the EPA concluded that even when the Denka plant was shut down during/after Hurricane Ida in September, 2021 levels of chloroprene were measured in excess of 0.2 µg/m³.

Sampling data reported by the EPA[25] at all six (6) locations (Chad Baker; 5th Ward; ESJB HS; Oschner Hospital; Acorn/Hwy 44; and the Levee) documented 14 elevated sample results (> 0.2 µg/m³) out of a total of 18 collected samples over a 18-day period (from EPA SPod continuous monitors) between 9/10/2021 – 9/28/2021 (no sample data was reported prior to 9/10 or after 9/28). At least one sample from every location was > 0.2 µg/m³ (the Levee had only 1 sample collected and it was elevated). Two thirds of the samples collected at the 5th Ward location were above 0.2 µg/m3 with the highest being 11x greater. Five of the six samples collected at the Chad Baker location, due south of Denka and and just about on the Denka fence line, were significantly elevated with one sample about 20x the 0.2 µg/m³ level and a second result, the highest concentration detected during September, 2021, of 23.66 µg/m3, 100x more than the EPA's target value of 0.02 µg/m³.

e. The annual average for chloroprene at EPA's air sampling at the 5th Ward Elementary School from October 2, 2019, to September 26, 2020, was 1.2 µg/m³,

---

[25] on their spread sheet -continuous-monitoring-summary-march-10-2020-through-august-16-2023-w-monitor-locations

including some shorter term (24- hour average) spikes as high as 16.6 µg/m³with a collocated sample showing15.3 µg/m³.

f.   The annual average concentrations for January 7 to August 4,  2022 at the two fence-line monitors closest to the 5th Ward were 0.51 µg/m³and 0.77 µg/m³, respectively. The highest detected concentrations at those monitors were 1.63 µg/m3 (Apr. 14-28, 2022) and 2.91 µg/m3 (Jan. 7-21, 2022), respectively, while only a few of the samples at those two locations were below 0.2 µg/m3" (pg 26).

My review of the excel spread sheet titled EPA SPod Monitoring La Place, Louisiana Community Denka, describing EPA continuous monitoring (i.e. short term or "peak" monitoring that measures and averages chloroprene concentrations over a 24 hour period) for sampling starting on 03/20/2020 and ending on 8/16/2023 for six (6) locations documented a number of significantly elevated peak/short term sample results. I identified the six locations as: (1) Chad Baker; (2) 5th Ward; (3) East St John the Baptist High School (I have concluded that the school designated as East St. John the Baptist High School, is actually East St John Preparatory Academy (ESJPA); (4) Oschner Hospital; (5) Acorn & Hwy 44; and (6) Levee.

## Figure 3: Average Chloroprene Concentration at Denka Fence-line Monitors (January – June 2022)



The above concentration mapping by the EPA (*Figure 3: Average Chloroprene Concentration at Denka Fence-Line Monitors - January-June 2022 – from the EPA Letter of Concern, page 29*), documents that even after Denka installed additional control technology significantly reducing average exposure levels to chloroprene (by some reports by as much as 85%) the actual measured exposures to chloroprene in the immediate vicinity of 5th Ward and impacting both Census Tracts 708 and 709, continued to reflect significantly elevated levels of chloroprene exposure (even using the maximum upper bound – MIR limit of 0.2 μg/m³ chloroprene levels ranged from slightly above 0.2 μg/m3 *on average – with much higher peak values also occurring*) to more than 7 times the minimally acceptable 0.2 μ μg/m³ (sample result of 1.53 μg/m3 at the bottom center of the map).

Additionally, it can be seen that sample results from more distant sampling points, especially to the north and east, toward La Place ES, are significantly below the levels seen closer to the Denka plant again highlighting the critical importance of relocating students and staff to LaPlace

ES which is approximately another mile to the NE in beyond Census Tract 709 and more than 2.25 miles from the Denka chloroprene emission sources.

44. The organic vapor chemical emissions from industrial plants like those located close to schools such as 5th Ward present grave concerns for the health, safety, comfort, welfare of children as has been reported by the US EPA in multiple studies, documents, reports and legal complaints filed between 2010 and 2022.  The information provided below is based on EPA's published findings and reports (including the EPA Complaint Nos. 01R-22-R6, 02R-22-R6, and 04R-22-R6, dated 10/12/2022).

   a. In its 2010 IRIS Chemical Assessment, EPA concluded that chloroprene is a "likely human carcinogen and that it acts through a mutagenic mode of action."

   b. As explained by the EPA, "A mutagenic mode of action means that a chemical induces cancer by beginning to damage DNA and producing mutations. When a person breathes in chloroprene, it causes DNA damage in the body's cells. The resulting mutations increase the likelihood that a person will develop cancer over the course of their lifetime."

   c. Individuals exposed to mutagenic carcinogens starting in early life as infants or young children are understood to be more susceptible than individuals exposed only as adults. Reasons for this susceptibility include more rapid cell division during early life resulting in less time to repair DNA mutations; more rapid expansion of mutant cells lead to cancer. The contribution to lifetime cancer risk from a single year of exposure to chloroprene is greater if that year occurred during childhood.

   d. Air monitoring stations with sampling devices were set up to measure chloroprene concentrations in ambient air, including monitoring near 5th Ward.

   e. Average concentrations of airborne chloroprene near the Facility have been consistently greater than 0.2 $\mu g/m^3$ since at least 2016.

45. There is an extensive body of information, evidence and regulatory guidance (including the EPA publication "School Siting Guidelines", Office of Children's Health Protection, EPA-100-K-11-004, October 2011) -- www.epa.gov/schools/siting that addresses toxic environmental exposures to school children from industrial and other HAP sources.  The U.S. Chemical Safety Board ("US CSB") is an independent, nonregulatory federal agency that investigates the root causes of major chemical incidents – the US CSB investigated school siting issues in connection with an explosion that occurred in an industrial facility located near K-12 schools in West Virginia. This report, "School Siting Near Industrial Chemical Facilities: Findings from the U.S. Chemical Safety Board's Investigation of the

West Fertilizer Explosion"[26] provides useful information related to the hazard posed to schools and children located in close proximity to industrial facilities.

    a. "The goal of this commentary is to illustrate the consequences of siting schools near facilities that store or use hazardous chemicals and highlights the need for additional regulations to prevent future siting of schools near these facilities." (US CBC report).

    b. "In light of the current lack of federal authority for oversight of land use near educational institutions, state and local governments should take a proactive role in promulgating state regulations that prohibit the siting of public receptors, such as buildings occupied by children, near facilities that store hazardous chemicals." (US CBC report)

    c. The following information comes from the EPA School Siting Guidelines Report:

        i. "EPA recommends that districts periodically inspect existing schools for potential environmental health and safety risks using tools designed for that purpose such as the EPA's Healthy Environments Assessment Tool ("HealthySEAT") or the National Institute for Occupational Safety and Health (NIOSH) Safety Checklist Program for Schools."

        ii. "Where deficiencies are found, EPA recommends steps to reduce student and staff exposure to potential hazards be identified and implemented."

        iii. "The overriding purpose of a school building is to provide a safe, healthy, and supportive environment in which children can learn. Children spend nearly a third of their typical day in the school environment, where they may be exposed to a range of contaminants both indoors and out. Such exposures can impact health and learning and negatively impact school attendance. Student exposure to environmental hazards at school can arise from multiple pathways, which may differ between locations. Each location may have different underlying causes of potential exposure, such as site contamination, neighborhood emission sources or indoor air quality problems."

        iv. "Poor indoor air quality can contribute to illness resulting in absence from school and acute health symptoms that decrease performance while at school. Poor indoor air quality may also directly reduce a person's ability to perform specific mental tasks requiring concentration, calculation or memory. Although children spend most of their school day inside the school

---

[26] School Siting Near Industrial Chemical Facilities: Findings from the U.S. Chemical Safety Board's Investigation of the West Fertilizer Explosion"2 August 2016. Environmental Health Perspectives,  V. 124, Issue 10, Pages 1493 – 1496 (https://doi.org/10.1289/EHP132)

building, they also spend time outdoors, such as during recess, physical
education class, physical activity outside of class time and getting to and
from school. Examples of contaminants that can be found in outdoor school
environments include air pollution from motor vehicles, pesticides and
industrial pollutants. Some of these pollutants also contribute to exposures
within the indoor environment in schools."

46. Schools like 5th Ward often serve marginalized communities. The compounded impacts of
pollution and reduced academic performance exacerbate existing social inequalities, making
it even more challenging for these students to break the cycle of poverty and disadvantage.

### D.  Students & Staff Must Be Relocated from 5th Ward as the Only Reasonable Approach

47. Clearly, exposures to HAPs at 5th Ward, principally from chloroprene vapor, presents an
exceedingly dangerous environmental health condition to students and staff.  Although in
some situations, it could be possible to use protective measures such as ventilation, or even
respiratory protection (e.g. face coverings such as masks as was done throughout the height
of the Covid pandemic) to minimize dangerous chemical exposure; that is not the case here
where ongoing airborne exposures to cancer-causing chemicals pose unacceptable exposure
and health risk.

48. Engineering, Administrative, and Personal Protective ("PPE") controls are typically "point
source" controls meant to control emissions at the source of chemical release, not at the
downstream exposure "receptors" (e.g. exposed individuals, school buildings, etc.)

49. The "hierarchy of control" approach is used by the United States Centers for Disease Control
(U.S. CDC) National Institute for Occupational Safety & Health "NIOSH") and other public,
occupational, and environmental health authorities and organizations to identify and
prescribe which controls should and can be used in specific situations is described below. [27]

The Hierarchy of Control is a widely recognized framework in occupational health and safety
that prioritizes the most effective strategies for mitigating hazards. The hierarchy consists of
five levels, listed in order of effectiveness: elimination, substitution, engineering controls,
administrative controls, and personal protective equipment (PPE). This framework can be
applied to the situation at 5th Ward, where students and staff are exposed to chloroprene
emissions from the nearby Denka Performance Elastomer plant.

---

[27] U.S. CDC, National Institute for Occupational Safety & Health ("NIOSH"), About Hierarchy of Controls
(https://www.cdc.gov/niosh/hierarchy-of-controls/about/index.html)



50. In all cases, whenever possible, the preferred approach – and a necessary one in the situation of 5th Ward and the chloroprene HAP exposure experienced by students and staff – is to *eliminate the hazard completely*; only where an exposure is unable to be eliminated, and while additional controls to adequately limit exposure to the HAP are put in place, would you attempt to design and use engineering controls such as ventilation, admistrative controls, or that would limit time of individual exposure to levels that would not subject students and staff to hazardous pollutant levels, or consider the use of and personal protective equipment ("PPE") to protect the exposed population.

51. Applying the Hierarchy of Control to the chloroprene exposure situation at 5th Ward clearly indicates that the most effective solution is elimination. Relocating the school eliminates the hazard, ensuring the safety and health of students and staff. Other control measures, such as engineering controls, administrative controls, and PPE, are either impractical or insufficient for providing comprehensive protection in a school environment. Therefore, relocation is the most viable and necessary action to protect the children and educational staff from the harmful effects of chloroprene exposure.

**Ventilation**

52. Given the nature of the exposure risks associated with chloroprene emissions impacting 5th Ward, in which there is a cancer-causing chemical with a "no safe exposure level" in the school environment (inside and outside of the building) the use of mechanical ventilation as a solution is not an effective control measure to employ at this building.

53. The effectiveness of ventilation systems is dependent on numerous factors including the rate of air exchange, the distribution of fresh air, and the maintenance of the ventilation system.

26

54. In the 5th Ward setting especially, achieving and maintaining the optimal level of ventilation to ensure safety from a potent carcinogen like chloroprene is, at best, practically impossible.

55. Chloroprene emissions from industrial facilities like the Denka Performance Elastomer plant pose significant health risks to nearby communities. To mitigate these risks, it's crucial to implement effective engineering controls. One of the most appropriate and effective methods for controlling chloroprene emissions is local exhaust ventilation (LEV) at the emission source. This approach directly targets the point of chloroprene release, capturing and containing the emissions before they disperse into the surrounding environment.

56. Local exhaust ventilation systems are designed to capture contaminants at or near their source of emission. For chloroprene emissions from the Denka plant, LEV systems can be installed at critical points where chloroprene is released during manufacturing processes. These systems use hoods, ducts, and fans to collect chloroprene vapors and remove them from the work area, typically filtering the air before it is released outside or redirecting it through treatment systems to neutralize harmful chemicals.

57. Attempting to use ventilation systems at 5th Ward or other nearby schools to filter out chloroprene vapor from the ambient air would be highly ineffective. General ventilation systems in buildings are designed to circulate and exchange indoor air but are not equipped to handle high concentrations of industrial pollutants like chloroprene that have already dispersed into the atmosphere.

58. Once chloroprene has dispersed into the air, it becomes much more challenging to capture and filter out using general ventilation systems. These systems are not designed to remove specific industrial contaminants at low concentrations over large outdoor areas.

59. General ventilation works by diluting contaminants, which is not sufficient for toxic substances like chloroprene. The effectiveness of dilution ventilation decreases significantly with the scale and outdoor nature of the environment.

60. Implementing an effective system capable of filtering chloroprene from the ambient air around a school would require extensive infrastructure, including high-capacity filters and continuous monitoring and associated maintenance systems.

- **Ineffectiveness of Particulate Filtration**

61. Standard ventilation systems in schools are typically equipped with particulate filters, including high-efficiency particulate air (HEPA) filters. While these are excellent for capturing dust, pollen, and other particulates, they are ineffective against gases and vapors like chloroprene.

62. Chloroprene is a VOC, meaning it exists in the gaseous state at ambient temperatures. Particulate filters, regardless of their efficiency, do not capture gases and vapors, thus allowing chloroprene to pass through the filtration system unimpeded.

- **Requirement for Specialized Filtration**

63. To effectively filter out chloroprene, activated charcoal filters are required. These filters work by adsorbing gases and vapors onto the surface of the charcoal granules; Activated charcoal filters are significantly more expensive than particulate filters. They also have a limited capacity and must be replaced frequently to maintain their effectiveness, especially in environments with high concentrations of VOCs like chloroprene.

- **Complex Installation and Maintenance**

64. Installing activated charcoal filters in existing school ventilation systems is a complex and costly process. These filters often require custom fittings and modifications to the existing HVAC infrastructure.

65. Maintenance of activated charcoal filters is labor-intensive. Filters need to be monitored regularly to ensure they are not saturated, which would render them ineffective. The replacement process involves handling and disposing of the saturated filters safely, adding to the operational complexity and cost.

- **Cost & Resource Constraints**

66. Schools often operate under tight budget constraints, making the implementation of expensive filtration systems a significant financial burden. The cost includes not only the initial installation but also the ongoing maintenance and frequent replacement of the activated charcoal filters.

67. Funding for such upgrades is typically limited, and resources might need to be diverted from other critical educational or infrastructural needs.

68. Retrofitting existing ventilation systems with activated charcoal filters can cause significant disruptions to school operations and ongoing costs.

- **Ineffectiveness in Outdoor Air Quality Control**

69. Even with an upgraded filtration system, the effectiveness is limited to indoor air quality. Schools often have open windows, doors, and outdoor activities, which means children and staff can still be exposed to chloroprene when they are outside or when the building's envelope is not sealed.

70. Outdoor air quality cannot be controlled by indoor ventilation systems, meaning that the primary source of chloroprene emissions—the Denka plant—needs to be addressed directly to ensure comprehensive protection.

71. In summary, filtering chloroprene from school ventilation systems is both technically challenging and practically impractical. Activated charcoal filters, while effective against gases and vapors, are expensive, require frequent replacement, and involve complex installation and maintenance processes. Additionally, these systems can only address indoor air quality, leaving outdoor exposures unmitigated. Attempting to manage chloroprene exposure through ventilation at nearby schools would be highly ineffective and impractical, as it does not address the root of the problem and fails to provide adequate protection for the community.

## Administrative Controls

72. Administrative controls administrative controls represent a set of strategies aimed at reducing exposure through changes in personal/work/educational practices, procedures, and policies, and typically include measures like reducing the amount of time spent by people in the affected environment in an attempt to reduce exposure to safe levels; examples include restricting workers from spending more than 15-30 minutes in an unavoidably high-noise location where remaining for hours or an entire shift would likely lead to hearing loss or, similarly, rotating individuals who work outside, doing construction or other activities in high heat and humidity, would place them at risk of heat stress and heat stroke.  In these cases, instead of having 1 or 2 people working for an entire 8-hour shift in those conditions, multiple people would be required to work and to spend much less time  in the dangerous conditions.

73. In any PK-12 educational situation, the use of Administrative Controls for environmental exposure to HAPs would be impractical and disruptive to the educational process and would not effectively prevent dangerous exposures to students and staff for the following reasons:

74. Implementing Administrative Controls would necessitate the limiting of outdoor activities such as recess, physical education classes, and outdoor events especially during times when chloroprene levels are likely to be elevated – this is not feasible in the 5th Ward school setting

where chloroprene levels are continuously elevated and where there is not practical way to determine airborne concentrations in a manner and timeframe that would allow for decisions about restricting activities to be made.

75. This would be particularly problematic in the case of 5th Ward which has no school gymnasium. Elementary school children require physical exercise and, in the absence of a gymnasium in the building (a significant and well-recognized facility deficiency) children would need to be able to play and exercise outside the building – an activity likely to result in increased exposure and that would be in opposition to the development and implementation of administrate controls of the type described.

76. To employ administrative controls to protect 5th Ward students and staff would require the development of an air quality monitoring schedule, by the school and district, in to restrict outdoor activities when chloroprene concentrations exceed safe levels – this is simply impossible to do in this situation.

77. Furthermore, the use of administrative controls does nothing to mitigate or eliminate the chloroprene concentrations in air impacting 5th Ward students and staff; it would merely acts to reduce the duration of exposure, which, in this case, is not a viable solution.

## **Personal Protective Equipment ("PPE")**

78. The use of PPE, particularly respiratory protection, is, obviously, not a feasible or effective solution in a school environment for many reasons.

    a. In order to protect against chloroprene, children  (and staff) would need to wear respirators equipped with organic vapor cartridges, such as those containing activated charcoal to filter out harmful vapors and gases; it is not possible to have normal conversation wearing ½ face (respirator fits over the bridge of the nose and under the chin) or full face (fits over the entire face) protective equipment– nonetheless only these types of respirators would work to filter out chloroprene to any degree.

    b. Effective protection requires a proper fit and seal, which is challenging to achieve with young children due to their varying face shapes and sizes. Respirators must be fitted correctly to be effective, and this is a complex process that requires specialized fitting sessions, which are not feasible for a large number of children.

    c. Children would need to wear these respirators continuously throughout the school day to ensure protection, including during all indoor and outdoor activities. This is highly impractical as it disrupts normal breathing, talking, eating, and other daily activities. It's unrealistic and inappropriate to expect young children to consistently use PPE

correctly. Moreover, PPE does nothing to eliminate the environmental air quality exposure to chloroprene.

d. Respirators can be uncomfortable, especially when worn for extended periods. Young children are likely to find them intolerable, leading to frequent removal or incorrect use, thus compromising the effectiveness of the protection.

e. Wearing respirators would significantly disrupt the learning environment. Children need to engage actively in classroom activities, ask questions, and interact with teachers and peers. Respirators hinder clear communication, making it difficult for students to participate fully in lessons.

f. Wearing respirators for long periods can cause discomfort and potential health issues, such as skin irritation and breathing difficulties. Children with respiratory conditions, such as asthma, may find it particularly challenging to use respirators.

g. Requiring 5-10 year old children, as well as elementary school staff, to wear respirators to protect against chloroprene exposure is an obviously impractical and ineffective approach. It is technically challenging to ensure proper fit and continuous use, disrupts the educational environment, hinders social interaction, and poses significant logistical and financial burdens. This approach makes no sense when considering the overall well-being and development of young children or the need for serious protection from a carcinogenic and mutagenic chemical such like chloroprene..

### Elimination of the Hazard

79. "Elimination" of environmental chloroprene exposures to 5th Ward students and staff, is the most effective and recommended control and the only one that can be used to ensure adequate reduction of exposure and harm given the current situation; hazard elimination in this case is best accomplished by moving 5th Ward students and staff to a school location as far from the chloroprene emission source as possible.

Supporting this approach as the only viable solution is a statement included in the May 2016 memo by the EPA (previously referenced in this Declaration) Air Toxics Program in discussing Denka's chloroprene emissions:

> "Under EPA's air toxics risk management framework, a cancer risk of 100-in-1 million is generally described as the upper limit of acceptability for purposes of risk-based decisions. Cancer risks at or below 1-in-1 million indicate little potential for cancer risk
>
> When existing source emissions are too high to achieve the 1-in-1 million level and controls are being considered, EPA is interested in controls that reduce off-site exposure concentrations associated with cancer risks to no higher than 1-in-1 million for as much of the nearby population as is feasible."
>
> Specifically relevant to the situation at 5th Ward and ESJPA, and with respect to Denka, the EPA continued, "At a minimum, we recommend that this facility aims for emission reductions such that the maximum annual average chloroprene concentration is no higher than 0.2 μg/m3 at the highest modeled off-site location. ***That being said, it is preferable to have the chloroprene concentrations at the highest modeled census block as close to 0.002 μg/m3 as reasonably achievable." <emphasis added>***

80. This situation, of course, directly applies to Denka, chloroprene, 5th Ward students and staff, and ESJPA in that the desired cancer risk level is no more than 1-in-1 million (equal to an average chloroprene level of 0.002 µg/m³) while the upper limit of acceptability level of 0.2 µg/m³ (a level 100x greater than what is considered to be the safest level) is permitted only "when existing source emissions are too high to achieve the 1-in-1million level and controls are being considered." This condition currently exists with Denka, 5th Ward and ESJPA and in census tract 708 and 709. In such cases, where emissions controls are unable to lower exposures to the 1-in-1 million cancer risk level, the ***EPA states that they are "interested in controls that reduce off-site exposure concentrations to no higher that 1-in-1 million for as much of the nearby population as feasible."*** <**emphasis added**>

81. The above statements and analysis by the EPA can only be seen as direct support for the critical need to immediately relocate 5th Ward students and staff to a building as distant from the chloroprene exposure source as possible and to not move 5th Ward students and staff to a school location (ESJPA) that is only a mile from the chloroprene emission sources at Denka and where sampling data has consistently documented elevated and dangerous exposures to chloroprene, in some cases, even exceeding those experienced at 5th Ward.

82. The maps, figures and wind rose data in the section below clearly illustrate the continuing and dangerous impacts associated with exposures to chloroprene from the Denka plant at both 5th Ward and ESJPA and highlight the fact that the LaPlace Elementary School is the only viable option for relocation of 5th Ward students and staff.

## III.   Maps & Figures





Map A. Denka Facility & School Locations

83. **Map A. Denka Facility & School Locations Map** shows school locations (5th Ward, ESJPA, LaPlace ES, and ESJ HS) and their distances to Denka chloroprene emissions sources.

   a. Emissions sources were identified from the 2016 Title V Permit Renewal Application for the Denka Performance Elastomer LLC Chloroprene Unit. In the document, Emissions Inventory Questionnaires (EIQ) for Air Pollutants contain locations reported in UTM coordinates. These coordinates were mapped as points, and a polygon was created with the outermost points to calculate the distance from emissions sources to schools. School locations are marked as points, and the distance between schools and the emissions sources polygon was calculated in ArcGIS and shown with lines.

   b. 5th Ward is just over 750 feet from the Denka plant fence line and less than ½ mile from the actual plant emission sources and ESJPA is approximately ¾ of a mile from the Denka plant fence line and just 1 mile from the actual plant emission sources. Both ESJPA and 5th Ward are within about 100' of the EPA monitoring boundary. This clearly demonstrates the much too close proximity of the Denka

33

plant site and emission sources, to both schools, resulting in elevated and hazardous concentrations of chloroprene to students and staff at ESJPA and 5th Ward.

c.  All but 2 of the emission sources are clustered in the southern part of the industrial facility with a significant concentration on the western side, closest to 5th Ward with two (2) emission sources located on the northern Denka sources polygon

d.  I have also concluded that the Denka Performance Elastomer industrial facility and grounds is located in both census tracts 708 & 709; 5th Ward is in census tract 708 and ESJPA is in 709. In addition to chloroprene monitoring data documenting ongoing hazardous chloroprene exposures at both school locations, cancer prevalence and risk data as summarized in this Declaration have established that Census Tracts 708 and 709 present cancer risks to children hundreds of times the EPA "safe" exposure level of 0.002 $\mu g/m^3$; Census Tract 708 had the highest reported cancer risk level in the U.S. and Census Tract 709 was not far behind.



84. **Map B. Chloroprene Monitoring Locations** shows Denka TO-15 Summa Canister Monitoring Stations, EPA Spod Monitoring Stations, and fence-line monitors in relation to nearby schools (5th Ward, ESJPA, and ESJ HS).

Geographic overlap between EPA Spod sampling (triangle) and Denka cannister sampling (squares) can be seen at locations 3, 4 & 5 on the map.



Map C. Average of Reported Chloroprene Concentrations (µg/m³)

85. **Map C. Average of Reported Chloroprene Concentrations (µg/m³)** clearly shows that the immediate vicinity around 5th Ward continues to experience elevated levels of chloroprene exposure.  Sampling results are shown for EPA (color-coded triangles), Denka (color-coded squares) and Fenceline sample (color coded circles). Colors relate to the exposure ranges for each.

a.  What is clearly shown is that all "average" sampling results from the combined total of 30 locations are all above the maximum upper bound-MIR level of 0.2 ug/m³.

b.  Results from EPA testing documents exposure concentrations of a low of more than 3 times the 0.2 ug/m³ to a high of more than 10 times above 0.2 ug/m³.

c.  Results of Denka monitoring are similar to EPA results and vary between approximately 2 – 13 times  greater than 0.2 ug/m³.

d.  Fenceline  monitoring, including in very close proximity to ESPJA (EPA and Denka location at "5  Hospital") ranged from a low of just above 0.2 ug/m³ to 7 times more than the 0.2 ug/m³ standard.



**Map D. Maximum Chloroprene Concentrations Reported in 2023 (µg/m³)** This map shows the maximum chloroprene concentrations observed in 2023 through EPA SPod Monitoring and Denka Summa Canister monitors. A maximum concentration of 29 µg/m³ was measured at 5th Ward. These maximum concentrations do not represent instantaneous peak concentrations, rather they are reported as 24-hour averages.

86. The results shown on Map D reflect EPA SPod and Denka cannister sampling maximum concentrations obtained from a review of available EPA and Denka sampling results from 2023.

   a. Maximum measured concentrations from EPA SPod sampling indicate short term spikes/peak exposures ranging from 11 times higher than 0.2 ug/m³ (at "Acorn & Hyw 44) to **140 times higher at the Chad Baker St. location**.

   b. Maximum measured concentrations for the Denka Summa Cannister sampling ranged from 5.5 times higher than 0.2 ug/m³ at Entergy to **50 times the 0.2 ug/m³ at Edgard.**

   c. For comparison, if we use the "safe" exposure level for a carcinogen such as chloroprene, the level of 1-in-1million, **the measured peaks described above are 5000 times – 14,000 times higher than the safe exposure level to chloroprene**.



Map E. Denka Facility, 5th Ward, & Census Tracts Satellite Imagery

87. **Map E. Denka Facility, 5th Ward, & Census Tracts Satellite Imagery** shows previously described boundaries in more detail. This includes the EPA fence-line monitoring range polygon, Denka emissions sources, Denka emissions sources polygon, and census tracts 705, 708 & 709. Satellite imagery is used as the base map to show the differences between the 2022 EPA Monitoring fence-line and the emissions sources perimeter. As shown, the EPA fence-line monitoring area includes fields and wooded areas that do not contain point sources of chloroprene emissions identified in the Title V permit.



Map F. Denka Facility & School Locations with Prevailing Wind Direction

88. **Map F. Denka Facility & School Locations with Prevailing Wind Direction** includes an inverted wind rose (bottom right hand corner) showing the prevailing wind direction during the 2023 calendar year. Several important considerations are highlighted by this map:

    a. Using calculated distance measurements from the closest emission point at Denka, to each school locations, LaPlace is 2.5x further from any chloroprene emission source than is ESJPA and 5x farther than 5th Ward which would typically result in substantially lower chloroprene concentrations than at either 5th Ward or ESJPA.

    b. The inverted wind rose, showing the predominant direction in which the wind is blowing shows that the frequency of wind to the NNE (toward LaPlace) is modest and that wind is most frequently moving towards the North and Northwest.

    c. As discussed in the following sections, both distance and wind affect the dispersion of pollutants in the air, and therefore, their levels (concentrations).

# WIND ROSE DATA & GAUSSIAN DISPERSION MODEL

## A.  Wind Rose Graphics

89. A wind rose is a graphical chart using a circular display to depict how wind speeds and wind directions are distributed at a given location and within a specified time period.  The Wind Rose charts represented in Figures A - E were generated by data provided from the New Orleans, La, International Airport and represent wind direction and frequency during calendar year 2023.

   a. Typically presented in a circular format, the "standard" wind rose (Figure A) shows the frequency of winds blowing *from* particular directions over a specified period. Inverted Wind Roses (Figures B-E) can be more visually intuitive, showing the direction that wind is moving to, instead of where it is coming from.

The length of each "spoke" around the circle is related to the frequency that the wind blows from a particular direction per unit time. Each concentric circle represents a different frequency, emanating from zero at the center to increasing frequencies at the outer circles.

Wind rose plots with spokes broken down into color-coded bands (Figures A & B) show various wind speed ranges. It is common for wind roses to be divided into 16 cardinal directions, such as north (N), NNE, NE, etc., although they may be subdivided into as many as 36 directions as is the case in this report

Wind rose plots can also show the how frequently wind blew in a particular direction at specifically identified wind speeds (Figures C – E).  This data can help in understanding the situation played by prevailing wind direction and speed with respect to pollutant exposure concentrations at locations specified distances and directions from the pollutant/emission source.

The Wind rose from New Orleans Intl Airport shows wind speeds and the directions wind was moving from in the specified time frame (calendar year 2023).

The Gaussian plume model (shown and represented in Figure F) helps us explain, predict, and estimate how pollutants disperse in the air after being emitted from a point emission source, like an industrial facility stack or chimney, as is the situation with chloroprene emission from Denka.

The Gaussian Plume Model  uses mathematical formulas to predict the concentration of pollutants at different distances and directions based on factors such as wind speed, wind direction, and the rate of pollutant emission.

**Figure A – Standard Wind Rose - <u>All Observed Wind Speeds (1/1/2023 – 12/31/2023)</u>**



90. The length of each of the thirty six (36) spokes in the **"standard"** wind rose (above) shows the frequency (from 0% - 4%) of wind *coming (blowing) from* a particular direction (for example, the single most prevalent wind direction band is the one coming (blowing) directly from the south. The wind speed frequency is indicated by the color bands that correspond to ten (10) speed intervals (mph) shown on the right hand side of the wind rose.

**Figure B – Inverted Wind Rose - <u>All Observed Wind Speeds (1/1/2023 – 12/31/2023)</u>**



*Inverted* Wind Rose – Shows the direction prevailing winds are blowing *towards*.

91. The Inverted Wind Rose can be more visually intuitive, showing the direction that wind is moving to, as opposed to moving from.  As will be understood by comparing Figures A & B the frequency and magnitude of wind direction band are opposites in that in Figure A the most frequent wind was blowing from the south where in Figure B we clearly see the direction in which the most frequent wind is blowing (i.e. toward the north).

Figure B highlights that for much of the year the predominant winds are northerly which is in the general direction of ESJPA and also towards the WSW in the general direction of 5th Ward.  Also noted is that winds blowing toward the E - NNE in the direction of LaPlace ES are less pronounced.  Wind roses details shown in Figures C, D & E help further support the fact that LaPlace is less impacted by directional wind contaminated by chloroprene from Denka than either 5th Ward or ESJPA.

**Figure C – Inverted Wind Rose – <u>8 – 13 mph Wind Speeds (1/1/2023 – 12/31/2023)</u>**



92. Figure C further demonstrates how the prevailing winds – when the most prevalent single wind speed of 8-13 miles per hour is segregated and looked at in isolation, shows that almost none of the wind in this wind speed category blows toward the NE where LaPlace ES is located (and when it does, the distance to LaPlace, from Denka of more than 2 miles) means that very little if any measurable airborne levels of chloroprene would be expected.

**Figure D – Inverted Wind Rose – 1.3 – 4 mph  Wind Speeds (1/1/2023 – 12/31/2023)**



**Showing the slowest wind speeds observed (1/1/2023 – 12/31/2023)**

93. This Inverted Wind Rose diagram describes how the majority of the time when the predominant wind direction was toward the NNE, NE, ENE (toward LaPlace ES), E, ESE, and SE was also when wind speeds were also the slowest and most stagnant. These kinds of conditions – slow (stagnant) wind speeds - means that pollutants, such as chloroprene from the Denka plant tend to remain closer to the original pollution/emission source (Denka) as opposed to traveling significant distances (.5 mi. – 1 mile) and remaining at the concentrations found closer to the source.

Gaussian pollutant dispersion modeling (Figure E) describes the situation where wind speeds are very low, such as less than 4 mph. In these situations, dispersion of pollutants like chloroprene is significantly reduced. This would lead to higher concentrations of the pollutant near the original emission source because the pollutants are not spread out as much as they would be where wind speeds higher. Additionally, low wind speeds can result in the pollutant not reaching locations further away from the source.

**Figure E – Gaussian Plume Model**



**Gaussian Plume Model Basics:**

94. The Gaussian plume model helps us estimate how pollutants disperse in the air after being emitted from a point source, like a factory chimney. It uses mathematical formulas to predict the concentration of pollutants at different distances and directions based on factors such as wind speed, wind direction, and the rate of emission.

     Several key factors affect dispersion:

     a. **Wind Direction and Speed:** With the wind blowing directly from the south to the north, pollutants will primarily travel north. The speed of 5 miles per hour is moderate, aiding in the gradual dispersion of the pollutant.

     b. **Emission Rate:** The amount of chloroprene emitted per unit time influences the concentration. More emissions result in higher concentrations near the source.

45

c. **Distance from the Source:** The concentration of pollutants decreases as the distance from the source increases. This is because the pollutants spread out more and mix with clean air, diluting their presence.

To understand the impact of chloroprene emissions from the Denka factory using a Gaussian plume model with a wind blowing from the south to the north at 5 miles per hour, I need to consider how this model predicts the concentration of pollutants at different distances from the source. Here's a simplified explanation:

**Calculating Concentrations at .5 miles vs. 2.25 miles:**

- At **.5** miles (the location of 5th Ward) from the emission source the concentration of chloroprene would be relatively high. This is because the distance is short, and there hasn't been much opportunity for the pollutant to disperse and dilute.

- At 2.25 miles away (approximate distance of LaPlace ES), the concentration would be significantly lower. The additional distance allows more air mixing and dispersal, which substantially reduces the concentration of the pollutant.

**Relative Difference in Concentration:**

- The relative difference in ground concentrations between .5 miles and 2.25 miles can be estimated using the Gaussian plume decay formula, where the concentration typically decreases with the square of the distance from the source. Mathematically, if the concentration at .5 mile is **C**, then at 2.25 miles, it could be roughly **C/2.25$^2$** (since $3^2 = 9$). This suggests that the concentration at 2.25 miles could easily be at least 90% less of the concentration at .5 miles from the source.

46

**Table 1: Modeled Chloroprene Concentrations In µg/m3 Per Unitary Emission Rate of 0.55 g/s**

| | School | 5th Ward | ESJPA | La Place Elementary |
|---|---|---|---|---|
| | Downwind Distance (miles) | 0.47 | 1.01 | 2.48 |
| | Downwind Distance (meters) | 756 | 1,625 | 3,991 |
| Wind speed (m/s) | Atmospheric Stability | Predicted concentration (µg/m3) | Predicted concentration (µg/m3) | Predicted concentration (µg/m3) |
| 1 | A | 1.98 | 0.22 | 0.01 |
| 1 | B | 8.97 | 1.93 | 0.33 |
| 1 | C | 22.88 | 5.72 | 1.13 |
| 1 | D | 65.07 | 18.87 | 4.80 |
| 1 | E | 126.72 | 37.13 | 9.96 |
| 1 | F | 292.11 | 84.59 | 23.56 |
| 5 | A | 0.39 | 0.06 | 0.003 |
| 5 | B | 1.79 | 0.39 | 0.07 |
| 5 | C | 4.57 | 1.16 | 0.23 |
| 5 | D | 13.04 | 3.80 | 0.96 |
| 5 | E | 25.36 | 7.43 | 1.99 |
| 5 | F | 58.41 | 16.94 | 4.71 |
| 10 | A | 0.22 | 0.02 | 0.001 |
| 10 | B | 0.88 | 0.22 | 0.03 |
| 10 | C | 2.31 | 0.55 | 0.11 |
| 10 | D | 6.49 | 1.87 | 0.48 |
| 10 | E | 12.65 | 3.74 | 1.00 |
| 10 | F | 29.21 | 8.47 | 2.36 |

95. Table 1 provides a summary of the results of the modeling analysis, showing relative concentrations (micrograms per meter cubed) on a per .55 grams per sec (".55g/s" emission rate basis) at each of the schools at the different wind speed and atmospheric stability conditions. The .55g/s rate relates to an estimated emission rate of about 19 tons of chloroprene per year which I believe reflects the most currently available information and data provided.

96. Atmospheric stability is an indication of air movement. Under stable atmospheric conditions, air can be thought of as more stagnant (corresponding to stability class F in Table 1). Under more stable conditions (including slower wind speeds), pollution lingers near the pollution source, resulting in greater concentrations of the contaminant nearby to the source, and much lower concentrations farther from the source.

    a. When atmospheric conditions are less stable (corresponding to stability class A) there is more air movement and turbulence, which serves to mix, disperse, and

dilute the polluted air away from the source, in the downwind direction of travel. With more air movement and turbulence, there is more dilution, and the resulting concentrations (pollution levels) are typically also lower than they are nearer to the source but the ratio of the concentrations between the emission source level and the receptor (location) level may vary.

b.  The modeling performed shows that regardless of the atmospheric stability and wind speed, pollution levels are lower farther away. Pollution levels at ESJPA are predicted to be greatest at low wind speeds and stable conditions (wind 1 m/s and stability class F), with the pollution lingering close to the Denka site. Concentrations are reduced with increasing wind speed and less stable atmospheric conditions (lowest at the modeled wind speed of 10 m/s and stability class A). In all cases, pollution levels are lower at ESJPA than at 5th Ward, and substantially lower at LaPlace.

c.  Especially because chloroprene, emitted by Denka, is carcinogenic and mutagenic, with unpredictable and significantly elevated short term/peak emissions substantially higher than annual average emissions, and with young children (birth − 16) as a particularly vulnerable affected population the wind rose and plume dispersion data, modeling and analysis further supports the decision to relocate students from 5th Ward to LaPlace ES. While wind conditions and atmospheric stability cannot be controlled, increasing the distance between the source of pollution and the affected students will result in substantially reduced exposures to chloroprene.

The results show that concentrations, as expected, decrease with increasing wind speed and are highest at more stable atmospheric conditions (stability, indicative of stagnant air, increasing from A to F). Most importantly, the results show that concentrations drop significantly with increasing distance from the Denka facility. The result summary provides the ratio of chloroprene levels at the St. John's school to the La Place ES. With the modeled .55 g/s (unitary) emission rate, the concentrations at the La Place school would be 10 to more than 200 times lower than at 5th Ward, depending on the meteorological conditions.

Furthermore, meteorological data indicated that the prevailing winds in the area are in the direction of the ESJPA, with much less frequent prevailing winds blowing in the direction of La Place ES.

The much greater distance to LaPlace ES and the prevailing wind direction support the initiative to locate students at the La Place ES.

Although air monitoring data indicate that concentrations of chloroprene are lower at ESJPA then they are at the 5th Ward, the concentrations obtained through monitoring at the ESJPA are still concerningly high. By relocating the students at the La Place school instead exposure to the cancerogenic chloroprene would be substantially reduced, given the greater distance of the La Place school to the Denka source and given the prevailing winds.

Pollution levels resulting from a stationary emission source (such as Denka) vary based on the amount of pollutants emitted and source parameters (e.g. velocity and temperature at which the pollutants are emitted), the distances between the source and the locations where the pollution levels are predicted, and meteorological factors (such as wind velocity and atmospheric stability, which is an indicator of the mixing of air). Pollutants emitted from a source disperse -- mix with ambient (outdoor) air and are carried downwind from the source. Farther from the source, pollution levels (concentrations) are lower, because more mixing with ambient air occurs. With higher wind speeds and less stable atmospheric conditions (more air movement and turbulence), pollution levels decrease to a greater degree with distance from the source. USEPA and other agencies have developed models to predict pollution levels that result from sources, such as Denka. Models typically used for regulatory purposes are AERMOD and AERSCREEN. These models are based on Gaussian dispersion equations.

A simplified Gaussian dispersion model was used to evaluate the trends in pollution levels at the three school locations discussed in this declaration. An emission rate of 0.55 grams per second (g/s) of chloroprene from Denka was modeled, based on an annual emission rate of ]. The modeling was performed at wind speeds of 1 meter per second (m/s), 5 m/s, and 10 m/s and at atmospheric stability classes A through F to reflect a variety of meteorological conditions that may occur. Atmospheric stability class A reflects unstable atmospheric conditions that increase turbulence and mixing of air, thereby lowering pollution levels. Atmospheric stability increases from A through F. Stability condition F reflects low turbulence and essentially stagnant air, which generally results in higher pollution levels, especially close to the source.

Under all conditions, the results of the analysis show lower pollution levels at greater distances from Denka, with LaPlace pollution levels predicted to be well below the pollution levels the other two schools. The modeling also shows higher pollution levels at lower wind speed and greater atmospheric stability (highest for stability class F). While wind speed and atmospheric conditions are beyond control, the source to school distance is a variable that can be affected. This analysis supports the relocation of students to LaPlace.

It should be noted that the results of the analysis can be used to understand trends in pollution levels at the schools as a result of Denka and the ratios of pollutant levels from one school to another. However, the numeric values of the predicted concentrations should not be used or compared with air quality or health based guidance or with monitoring values. There are several reasons for this. The modeling performed does not account for actual peak emissions from Denka, individual sources and source locations at Denka, the exhaust parameters of the sources (such as exhaust velocity, height, diameter, etc), or the hourly meteorological data, including wind direction and the pairing of the variability of emission rates with the variability of meteorological conditions.

97. The EPA has set a stringent acceptable risk level for chloroprene exposure due to its carcinogenic potential. A cancer risk assessment conducted by the EPA in 2010 concluded that even small amounts of chloroprene exposure can cause significant health effects. Schools should be located at least several miles from emission sources to avoid the immediate danger zone. Additionally, EPA research shows that children are more susceptible to hazardous air pollutants (HAPs) due to their developing respiratory systems and higher rates of air intake

relative to their body weight making it crucial to minimize children's exposure by distancing schools from emission sources.

Taking into account ongoing residential exposure risks to chloroprene, and the hazard posed to children, especially those of elementary school age, from chloroprene exposure, schools should be located as far away as possible from the chloroprene emission source.

98. The precautionary principle dictates taking action to prevent potential harm when evidence suggests even plausible risk – both of these conditions are present with respect to relocating 5th Ward  students as far as possible from the source of chloroprene exposure. Moving 5th Ward students to LaPlace ES, further than 2 miles from the plant, aligns with this principle to ensure their safety; relocating them to  ESJPA does not.

99. Air quality monitoring data has shown that chloroprene levels are highest within the first mile around the Denka plant. This data backs recommendations to maintain a buffer zone of at least 1.5-2 miles from the plant to protect sensitive populations like schoolchildren (while no specific distance is universally mandated, public health principles suggest maintaining a significant buffer zone around industrial pollution sources like Denka to protect sensitive populations).


## C. Comparison of ESJPA School & LaPlace ES as Destinations


100.  Pollutants emitted from a source disperse in the atmosphere as they are carried downwind from the source to a receptor. As is well-recognized and established, concentrations levels of VOC HAPs, at specific receptor locations such as schools, decrease with increasing distance from a source.  Actual dispersion of pollutants in the atmosphere depends on a number of factors, including meteorological conditions, such as wind speed and direction, air temperature, terrain, source exhaust temperature, exhaust flowrate, and exhaust height.

101.  When detailed and specific monitoring data are insufficient or unavailable at specific locations and/or times, or to analyze future scenarios to predict likely outcomes, EPA and other agencies use dispersion models to estimate pollutant concentrations at locations of concern (commonly used models are the AERMOD and AERSCREEN dispersion models both of which are "Gaussian" dispersion models.)

These models can calculate the concentration of a pollutant at designated points based on the emission rate of the pollutant (the amount emitted by the source per unit time), meteorological conditions, and distance from the source. Gaussian models predict future outcomes based on past data. For instance, if you understand the distribution of pollution levels near a factory, you can estimate the concentrations of airborne pollution at different locations away from the emission source.

Gaussian models can also help simulate and understand how pollutants spread in the air. Doing this requires considering wind direction, speed, and other factors to predict pollutant concentration at different distances from a source.

102.  Using a simplified modeling tool based on Gaussian dispersion equations, I compared the concentration levels at each of the three schools – 5th Ward, ESJPA, and LaPlace ES using

a unitary emission rate of .55 g/s (grams per sec) of chloroprene emission at wind speeds of : (a) 1 m/s  (meters per second) = to 2.2 mph); (b) 5 m/s (11.2 mph); and (c) 10 m/s (22 mph). I also used metrics for "atmospheric stability" i.e., atmospheric stability classifications A through F.) The modeling tool was available on the California State University, Northridge website (http://www.csun.edu/~vchsc006/469/gauss.htm).

As discussed, dispersion of pollutants depends on the stability of the environment into which the pollutants are released. Mathematically, within the model, this is reflected in the horizontal and vertical dispersion coefficients of the plume. In an unstable atmosphere, the pollutants tend to rise unhindered unless acted upon by some other force (i.e., incoming air mass). Conversely, in a stable atmosphere, the pollutants tend to remain at or near the height of the release point, and are assumed to travel downwind until they reach the ground. Pasquill (1961) used the strength of incoming sunlight (i.e., insolation) and cloud cover to represent atmospheric stability, and divided the possible meteorological conditions into six categories, A, B, C, D, E, and F, where A is the most unstable environment and F is the most stable.[28]

## IV.  **Conclusions**

103. Based on the exposure profile of the HAPS, especially including the carcinogen chloroprene, as consistently and extensively measured and documented by the EPA for at least the past eight (8) years (since 2016 or before) and the ability of chloroprene, as a volatile organic compound to spread easily in the air, as well as the  recognized limitations and impracticalities of employing other control measures such as the use of ventilation (in this situation), administrative controls, and personal protective equipment to predictably and effectively control exposures to hazardous chemicals in the 5th Ward situation, the only truly effective protective measure to be employed is the complete elimination of exposure, which in this case, would mean relocating the school population away from the contaminated area. This approach aligns with the highest standards of the public health obligation especially to protect vulnerable populations, including children, from hazardous environmental exposures.

   a.  In the case of the 5th Ward, continuous environmental monitoring has consistently shown elevated levels of chloroprene, surpassing any conceivable safe threshold, thus exposing the school's occupants to unacceptable cancer risks.

---

[28]   https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/Air-Quality/Air-Quality-Rule-Air-Thresholds-Appendix.pdf). The model predicts concentrations at each school location assuming that the wind blows directly toward that location.

b.  Chloroprene is a volatile organic compound (VOC) that can easily vaporize and spread through the air. This characteristic makes it challenging to control once released into the environment.

c.  Ensuring that chloroprene exposures can be eliminated, while the opening of windows and doors, at least to some degree, continues to occur, and given the need for children to have time to play and use outdoor spaces, and other conditions that predictably lead to ongoing, and potentially dangerous exposures, also clearly supports the need for the immediate removal of students and staff from the 5th Ward.

104.  Chloroprene is classified as a "likely human carcinogen" by the Environmental Protection Agency (EPA). In the realm of toxicology and public health, it is well-established that certain carcinogens, including chloroprene, have no threshold of safe exposure. Even minimal levels of exposure pose a risk of cancer causation, as carcinogenic effects do not follow a dose-response relationship. This principle is vital in understanding the inherent risks posed to the children and staff at the school.

105.  It is a medically and scientifically established fact that children are not simply small adults; their bodies are still developing, making them more susceptible to environmental carcinogens. This increased vulnerability is due to several factors, including higher rates of cellular division, lower body weight, and developing organ systems.

a.  The continuous exposure of children in this elementary school to chloroprene significantly elevates their risk of developing long-term health complications, including cancer. The school, therefore, becomes an environment where their fundamental right to health and safety is compromised.

106.  If students **do not live or reside** in the community most directly affected by, and in closest proximity to, the Denka plant and other polluters then relocating them out of the school for the school day will significantly minimize the dangerous chemical exposures and associated impacts faced.

107.  If students **do live and reside** in the community most directly affected by, and in closest proximity to, the Denka plant and other polluters then keeping them out of the school for the school day will minimize their exposures and associated impacts during the 6-8 hours during the school day, 5 days a week, throughout the school year.

a.  The hours when students are in school are periods of high activity and requiring a need for concentration and attention.

b.  If students are relocated so they are not exposed to chemical hazards during "school hours" effective exposures would be expected to be lowered by at least 1/3.

108.  Supporting the descriptions and analysis of collected data are maps A-F on pages $33 - 39$ (and in larger format to aid in viewing in Appendix 1). The maps show the distances, proximity and geographic relationships between 5th Ward, ESJPA, and LaPlace ES as well as providing a high level summary of sampling data related to chloroprene concentrations. Map F on page 39, includes a wind rose diagram as well.

Additionally, I have provided description and information related to prevailing wind direction (Figures $A - D$ on pages 41-44) and gaussian plume dispersion modeling (pg 45), demonstrating the effect of chloroprene emission source(s) (Denka) to receptor (schools, sampling point locations, and census tracts) distances on chloroprene contaminant levels, and, by extension, cancer risk to 5th Ward students and staff, at the school locations.

109.  Ongoing chloroprene source emissions from Denka Performance Elastomers, in addition to long-term sampling data (stretching back at least to 2016) reported by the EPA, LDEQ, and Denka measuring ongoing, persistent and elevated chloroprene levels in air, and in combination with information presented about the effects of wind direction and distance related to chloroprene exposure in air,  clearly documents that  5th Ward students and staff should be  relocated **as soon as possible** from their current school building facility, and that the  only viable (safest) option under current consideration is LaPlace ES.

110.  In conclusion, the current situation at 5th Ward Elementary School in St. John the Baptist Parish, Louisiana, presents a critical and unacceptable risk to the health and safety of its students and staff due to ongoing hazardous air pollution from the nearby Denka Performance Elastomer Plant. Despite significant efforts and the installation of major controls to reduce chloroprene emissions since 2018, the measured and reported levels of chloroprene in the air remain alarmingly high.

111. Continuous monitoring, including peak and average exposure measurements, has consistently shown that chloroprene concentrations in the vicinity of both 5th Ward Elementary School and East St. John Preparatory Academy, as well as in Census Tracts 708 and 709, far exceed safe exposure levels. In many cases, chloroprene levels exceed the Maximum Upper Bound-MIR level of 0.2 µg/m³ by more than a factor of 100. Additionally, sampling data from the EPA, Denka, and LDEQ indicate that chloroprene concentrations are thousands of times higher than the safe exposure benchmark level of 0.002 µg/m³. The documented cancer risks to the population attending both schools, particularly children under the age of 16, are significantly higher than national and state averages, posing an increased and unacceptable risk of cancer and other serious health issues.

112.  The existing school buildings and their systems are fundamentally inadequate to protect the health of students and staff from chloroprene exposure. The ventilation and air filtration systems in place are not capable of reducing chloroprene levels to ensure a safe indoor environment. Advanced filtration systems, such as activated charcoal filters, which are necessary to reduce chloroprene to acceptable levels, are impractical to install and maintain

in a school setting and do not address outdoor exposure during daily activities. Consequently, both the indoor and outdoor environments around the schools remain contaminated with hazardous levels of chloroprene, continuously exposing children and staff to this dangerous chemical.

113.  Given the ongoing and elevated ambient exposures to chloroprene and the associated cancer risks, it is evident that the current locations of 5th Ward Elementary School and East St. John Preparatory Academy are unsuitable for occupancy. To protect the health and safety of the students and staff, immediate action is necessary to relocate the students to a safer area, farther from the direct influence of the Denka plant's emissions. Only by eliminating the source of exposure can a healthy learning environment be ensured, safeguarding the future well-being of the community's youngest and most vulnerable members.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information and belief.

Executed on: June, 12, 2024

JERRY ROSEMAN

54

**<u>APPENDIX  1 – MAPS</u>**

## Map A. Denka Facility & School Locations



### Legend

- ○ Denka Emissions Sources
- ▮ Denka Sources Polygon
- — Distance (miles) from sources to schools
- — Census Tract
- — Fence-line

- ◉ East St. John High School
- ◉ East St. John Preparatory School
- ◉ LaPlace Elementary School
- ◉ 5th Ward Elementary School

56

## Map B. Chloroprene Monitoring Locations



### Legend

| | |
|---|---|
| ∘ Emissions Sources | |
| ▪ Denka Sources Polygon | |
| ● EPA Fence-line Monitors | |

△ **EPA SPod Monitoring Stations**
1 - Acorn & Hwy 44
2 - ESJ HS
3 - 5th Ward ES
4 - Levee
5 - Hospital
6 - Chad Baker St.

■ **Denka TO-15 Summa Canister Monitoring Stations**
1 - Entergy
2 - Railroad
3 - Western
4 - Levee
5 - Hospital
6 - Edgard

◉ **East St. John High School**
◯ **East St. John Preparatory School**
◯ **5th Ward Elementary School**

57

Map C. Average of Reported Chloroprene Concentrations (µg/m³)



Map D. Maximum Chloroprene Concentrations Reported in 2023 (µg/m³)



### Legend

○ East St. John High School
○ East St. John Preparatory School
○ 5th Ward Elementary School

○ Emissions Sources
▪ Denka Sources Polygon
▪ EPA Fenceline Monitor Range
— Census Tract

**EPA SPod Monitoring**

| Location | Max. Conc., 1/23-12/23 |
|---|---|
| 1 - Acorn & Hwy 44 | 2.30 |
| 2 - ESJ HS | 2.31 - 3.76 |
| 3 - 5th Ward ES | 3.77 - 6.37 |
| 4 - Levee | 6.38 - 15.11 |
| 5 - Hospital | 15.12 - 29.04 |
| 6 - Chad Baker St. | |

**Denka TO-15 Summa Canister Monitoring**

| Location | Max. Conc., 1/23-11/23 |
|---|---|
| 1 - Entergy | 1.10 |
| 2 - Railroad | 1.11 - 4.90 |
| 3 - Western | 4.91 - 7.80 |
| 4 - Levee | 7.81 - 9.10 |
| 5 - Hospital | 9.11 - 10.00 |
| 6 - Edgard | |

59

## Map E. Denka Facility, 5th Ward, & Census Tracts Satellite Imagery



**Legend**

- ∘ Denka Emissions Sources
- ▮ Denka Sources Polygon
- ● EPA Fence-line Monitors
- — Census Tract

Map F. Denka Facility & School Locations with Prevailing Wind Direction



## APPENDIX 2: METHODOLOGY

In preparing this Declaration, and arriving at the conclusions and opinions reached, I performed the following:

1. Review of documents, reports, materials and information provided to me by the NAACP LDF team including but not limited to:

   a. Mar. 31, 2018: B. Robichaux, Student cancer exposure causes concern during town hall (L'Observateur) Student cancer exposure causes concern during town hall - L'Observateur | L'Observateur (lobservateur.com)

   b. June `13, 2018: W. Subra/La. Env. Action Network, EPA Region 6 Environmental Justice Forum, Benefits of Air Quality Monitoring in Environmental Justice Communities https://www.epa.gov/sites/default/files/2018-06/documents/benefits_of_air_monitoring_in_environmental_justice_communities.pdf

   c. June 14, 2018: A Reference Document for the Preliminary Assessment of Chloroprene Levels in St. John The Baptist Parish: Evaluation of Potential Health Risks for Elementary School Students based on Early Sampling Results following Emissions Reductions

   d. Feb. 22, 2021: A. Katner/LDF, "FAQs on Environmental Conditions of St. John the Baptist Parish Public Schools" https://www.naacpldf.org/wp-content/uploads/LDF_02232021_StJohnFAQs-6.pdf

   e. May 6, 2021: Petition to The Administrator, United States Environmental Protection Agency: Petition for Emergency Action Under the Clean Air Act, 42 U.S.C. § 7603 *et seq.*, to Abate the Imminent and Substantial Danger to St. John the Baptist Parish, Louisiana Residents from Toxic Air Pollution *and* Petition for Rulemaking under the Clean Air Act, 42 U.S.C. § 7412, to Set Health-Protective Air Toxics Emissions Standards

   f. Jan. 20, 2022: Title VI EPA Complaint filed by Concerned Citizens of St. John and Sierra Club & Exhibits 01R-22-R6 Complaint_Redacted.pdf (epa.gov)

   g. April 11, 2022: A. Katner, "St John the Baptist Parish Chloroprene Monitoring Demonstration" https://louisianacancer.org/wp-content/uploads/2022/04/LSU_Chloroprene-Monitoring-Report_2022_FINAL-3.pdf

   h. Oct. 12, 2022: EPA Letter of Concern to La. Dept. of Env. Quality & La. Dept. of Health (in response to Jan. 2022 Complaint) https://www.epa.gov/system/files/documents/2022-10/2022%2010%2012%20Final%20Letter%20LDEQ%20LDH%2001R-22-

R6%2C%2002R-22-R6%2C%2004R-22-R6.pdf (*note that the EPA closed this investigation a few months ago).

    i.  February, 2023 EPA Complaint (Case 2:23-cv-00735 Document 1 Filed 02/28/23)

    j.  March 20, 2023: USA Motion for Preliminary Injunction

    k.  July 14, 2023: Private Plaintiffs Status Report And Request For Emergency Status Conference

2.  Reviewed EPA reports, data and information related to air quality metrics and exposure conditions impacting school students, especially children under the age of 16, as referenced throughout this Declaration in order to assess environmental exposure risks and health impacts related to exposures to hazardous air pollution from chloroprene.

3.  Reviewed multiple EPA reports, data and information, referenced throughout this Declaration, related to the specific exposure and air quality conditions as well as HAP sampling and monitoring and impacts, including for chloroprene levels, affecting 5th Ward. This included, but was not limited to, review of available air sampling data and information associated with the EPA's monitoring of chloroprene emissions which began in 2016 (following the agency's Integrated Risk Information Systems risk assessment conducted in 2010).

4.  Reviewed reports, declarations, research and writing of multiple experts as provided including the Declaration Statements, supporting research, conclusions and opinions included in the 552-page United States' Motion for Preliminary Injunction Against Denka Performance Elastomer LLC, filed on March 20, 2023 in the case of United States of America v. Denka Performance Elastomer, LLC et al., Civil Action No. 2:23-cv-735, in the United States District Court of the Eastern District of Louisiana.

5.  Reviewed authoritative reports and materials, referenced throughout this Declaration, such as those from the EPA, the World Health Organization (WHO), and academic researchers, who have documented and recognized that good EAQ is an essential component of a healthy facilities environment.

6.  Analyzed the available information and data, referenced throughout this Declaration, about the documented hazardous air pollutant exposures issues to examine the relationship between these exposures and adverse health and educational impacts on elementary school-aged children.

7.  Additionally, the basis for my opinions and conclusions includes relying on my experience and expertise in working in the fields of environmental and occupational science and health and safety and building science for 45 years with a major focus in directly evaluating and assessing chemical, physical and biological hazards to school children and staff as well as evaluating the facility conditions and building systems designed to maintain safe and healthful conditions.

8.  Furthermore, and based in my experience and expertise, I relied on my understanding that environmental air quality ("EAQ") issues, in general, whether originating from inside or

outside of the building, are considered to be facility condition issues. Environmental issues are manifested in many ways including EAQ issues directly impacting, and being directly impacted by, other facility condition issues with major facility systems such as roofing, Heating Ventilation Air Conditioning ("HVAC"), windows, hazardous material use (e.g. asbestos and lead), and cleanliness all playing a roll in how EAQ adversely impacts school occupants.

## APPENDIX 3: REFERENCES

1. An environmental justice assessment of the mississippi river industrial Corridor in Louisiana, U.S. using a gis-based approach *in* Applied Ecology and Environmental Research, December 2013.

2. School Siting Near Industrial Chemical Facilities: Findings from the U.S. Chemical Safety Board's Investigation of the West Fertilizer Explosion"2 August 2016. Environmental Health Perspectives, V. 124, Issue 10, Pages 1493 – 1496 (https://doi.org/10.1289/EHP132)

3. https://www.epa.gov/sites/default/files/2015-07/documents/determ.pdf

4. https://www.epa.gov/sites/default/files/2015-07/documents/apps-10x-sf-for-cra.pdf

5. U.S. EPA. Washington, DC: U.S. EPA; 2005c. Supplemental Guidance for Assessing Susceptibility from Early-life Exposure to Carcinogens. 630-R-03-003F. https://epa-prgs.ornl.gov/chemicals/help/documents/CHILDRENS_SUPPLEMENT_FINAL_%5b1%5d.pdf

6. Firestone M, Berger M, Foos B, Etzel R. Two Decades of Enhancing Children's Environmental Health Protection at the U.S. Environmental Protection Agency. Environ Health Perspect. 2016 Dec 1;124(12):A214-A218. doi: 10.1289/EHP1040. PMID: 27905272; PMCID: PMC5132627.

7. University Network for Human Rights. "Waiting to Die:" Toxic Emissions and Disease Near the Louisiana Denka/DuPont Plant. July 2019.Retrieved from: http://www.humanrightsnetwork.org/waiting-to-die

8. U.S. EPA. Washington, DC: U.S. EPA; 2005a. Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to Environmental Contaminants. EPA/630/P-03/003F. https://www.epa.gov/sites/production/files/2013-09/documents/agegroups.pdf

9. U.S. EPA. Washington, DC: U.S. EPA; 2005c. Supplemental Guidance for Assessing Susceptibility from Early-life Exposure to Carcinogens. 630-R-03-003F. https://epa-prgs.ornl.gov/chemicals/help/documents/CHILDRENS_SUPPLEMENT_FINAL_%5b1%5d.pdf

10. U.S. EPA. Washington, DC: U.S. EPA; 2005b. Guidelines for Carcinogen Risk Assessment. 630/P-03/001F https://www.epa.gov/sites/production/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf

11. U.S. EPA. Washington, DC: U.S. EPA; 2005c. Supplemental Guidance for Assessing Susceptibility from Early-life Exposure to Carcinogens. 630-R-03-003F. https://epa-prgs.ornl.gov/chemicals/help/documents/CHILDRENS_SUPPLEMENT_FINAL_%5b1%5d.pdf

12. U.S. EPA. Child-Specific Exposure Factors Handbook. EPA/600/R-06/096F. 2008a https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=199243

13. U.S. EPA. Washington, DC: U.S. EPA; 2011a. Exposure Factors Handbook 2011 Edition (Final).EPA/600/R-09/052F https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=236252

14. World Health Organization, Department of Public Health, Environmental & Social Determinants of Health, Climate and Other Determinants of Health Cluster; *Air Pollution and Child Health: Prescribing Clean Air, Summary, 2018*

15. EPA, Report to Congress 1999, p. 45, EPA-453/R-99-001

16. Letter from Kelly Rimer, Leader, Air Toxics Assessment Group, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, U.S. EPA to Frances Verhalen, P.E., Chief, Air Monitoring Grants Section, EPA Region 6, Preliminary Risk-Based Concentration Value for Chloroprene in Ambient Air (May 5, 2016).

17. EPA, "IAQ Tools for Schools: Why Indoor Air Quality is Important to Schools" (https://www.epa.gov/iaq-schools/why-indoor-air-quality-important-schools)

18. Occupational Safety & Health Administration ("OSHA") Indoor Air Quality- Schools (https://www.osha.gov/indoor-air-quality/schools)

19. American Society of Heating, Refrigeration & Air Conditioning Engineers ("ASHRAE") "Design Guidance for Education Facilities: Prioritization for Advanced Indoor Air Quality"  2023

20. https://www.lung.org/getmedia/14c45699-8055-4cdc-8695-7a57ae36058a/ALA-IAQ-School-V2.pdf

21. American Lung Association Website - https://www.lung.org/clean-air/at-school/iaq-guide#:~:text=Research%20has%20shown%20indoor%20air,comparison%2C%20and%20reading%20and%20comprehension&text=Reduce%20absenteeism%20due%20to%20lung%20diseases%20such%20as%20asthma

22. Assessing      Outdoor      Air      Near      Schools. https://www3.epa.gov/air/sat/#:~:text=School%20Environments%20In%202009%2C%20as,of%20187%20of%20these%20pollutants

23. Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens, EPA/630R-03/003F (https://www.epa.gov/sites/default/files/2013-09/documents/childrens_supplement_final.pdf)

24. NCI-NIH 2008-2009 Annual Report on Reducing Environmental Cancer Risk, 2010 https://deainfo.nci.nih.gov/advisory/pcp/annualreports/pcp08-09rpt/pcp_report_08-09_508.pdf

25. Kimberly A Terrell and Gianna St Julien 2022 *Environ. Res. Lett.* 17 014033

26. NRC 2006 pp. 6, 245; 2009 p.6, 118; EPA 2005a, p. 1-11, NIOSH 2016 pp. vi, 20, WHO 2020 pp. 5-43)

27. U.S. EPA, 2022 10 12 Final Letter LDEQ LDH 01R-22-R6, 02R-22-R6, 04R-22-R6.pdf (accessed      here: https://www.epa.gov/system/files/documents/2022-10/2022%2010%2012%20Final%20Letter%20LDEQ%20LDH%2001R-22-R6,%2002R-22-R6,%2004R-22-R6.pdf

28. EPA in Louisiana - LaPlace, Louisiana - Frequent Questions https://www.epa.gov/la/laplace-louisiana-frequent-questions

29. EPAfactsheet on chloroprene https://www.epa.gov/sites/default/files/2016-10/documents/chloroprene.pdf

30. ST. JOHN THE BAPTIST PARISH SCHOOL BOARD, Student Assignment Report Spring 2024

31. Spread sheet -continuous-monitoring-summary-march-10-2020-through-august-16-2023-w-monitor-locations

32. School Siting Near Industrial Chemical Facilities: Findings from the U.S. Chemical Safety Board's Investigation of the West Fertilizer Explosion"2 August 2016.

66

Environmental Health Perspectives,  V. 124, Issue 10, Pages 1493 – 1496 (https://doi.org/10.1289/EHP132)

33. U.S. CDC, National Institute for Occupational Safety & Health ("NIOSH"), About Hierarchy of Controls (https://www.cdc.gov/niosh/hierarchy-of-controls/about/index.html)