**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| KATHY DUHON, *et al.*, | * | Civil Action No. 90-1669 |
|    *Plaintiffs* | * | |
| | * | |
| v. | * | Judge Jay C. Zainey |
| | * | |
| ANN T. TATJE, *et al.*, | * | |
|    *Defendants* | * | |
| | * | |
| | * | |
| HEMON HARRIS, JR. *et al.* and the | * | Consolidated with |
| UNITED STATES OF AMERICA | * | No. 13,212-A-3 |
|    *Plaintiffs* | * | |
| | * | |
| v. | * | |
| | * | |
| ST. JOHN THE BAPTIST PARISH | * | |
| SCHOOL BOARD, *et al.* | * | |
|    *Defendants* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION**
**FOR FURTHER RELIEF, DISCOVERY, AND AN EVIDENTIARY HEARING**

After originally filing this desegregation case approximately sixty-one (61) years ago, purported *Harris* Plaintiffs in this case now seek to inject new and never-before litigated environmental issues that go far beyond the scope of this case. Notably, it is not clear who authorized the *Harris* Plaintiffs to file their Motion because there has never been a substitution of Plaintiffs in nearly sixty-one (61) years.[1] Are counsel running this case, or are actual Plaintiffs making decisions on behalf of the purported class? As St. John the Baptist Parish School Board ("Board" or "District") counsel informed the Court, the public meetings regarding closure of Fifth Ward, conducted in three (3) different communities at the insistence of counsel for *Harris* Plaintiffs, revealed near unanimous opposition to such a closure. So, who actually is filing the Motion insisting that the Board do so?

---

[1] Undersigned counsel notes that the *Duhon* Plaintiffs are not party to the *Harris* Plaintiffs' Motion. Thus, any reference to "Plaintiffs" in this Memorandum refers only to the *Harris* Plaintiffs unless otherwise stated.

In any event, environmental issues are clearly far beyond the scope of this case. The original claims in this case regarded integration of schools, not environmental issues. Plaintiffs try to cobble together a few cases to claim support for their cause; however, even a cursory review of the cited cases show they are distinguishable and present no support for instituting legal obligations in this case to address third-party environmental issues, particularly those that arose *after* a lawsuit was filed. Importantly, Plaintiffs conveniently omit from their Motion any facts regarding the history of litigation against and by the owner of the subject plant Denka Performance Elastomer LLC ("Denka") related to environmental issues. Denka related issues were and are currently being litigation in at least four (4) federal cases. Plaintiffs, apparently unsatisfied by those efforts to date, now ask this Court to wade into this thicket – which may result in Denka or even the State of Louisiana seeking to enter into this case somehow to address these environmental allegations.

Next, the Board opposes Plaintiffs' discovery requests. Despite telling this Court in their Motion and at the recent status conference that their discovery would be "limited" to the subject of their Motion, Plaintiffs have propounded broad discovery requests seeking sixty-one (61) years' worth of information about any and all aspects of this case. Indeed, this Court made it abundantly clear during the June 20, 2024, status conference that it was not authorizing a "fishing expedition." While Board counsel agreed to accept service of the discovery at the status conference, it was not until their discovery was actually provided to counsel that the true nature of Plaintiffs' so-called "limited" discovery come to light. As detailed below, Plaintiffs' discovery requests were not limited to the solitary issue before the Court but seeks information on all aspects of this case since 1963. The Court should rescind its prior authorization or severely limit the discovery – if discovery is even appropriate as environmental issues are far outside the scope of this litigation.

Furthermore, even if this Court should decide that it has jurisdiction in a school desegregation case to address a Motion based not on a "vestige" of the former *de jure* segregated school system but

rather on an environmental issue, it should still deny the Motion for a number of reasons. For example, a decision to close Fifth Ward Elementary (after appropriate notice, discovery, and an evidentiary hearing) does not necessarily mean that those students should all be assigned to LaPlace Elementary School, as requested in Plaintiffs' Motion. Such reassignment does not improve racial demographics at LaPlace Elementary Schools (which demonstrates yet again that Plaintiffs' Motion is not related to desegregation), and it effectively closes East. St. John Preparatory School (grades 5-8) because Fifth Ward Elementary was its only feeder school. As noted in the attached Report from the Board's demographer and expert Mr. Michael C. Hefner, there are less onerous alternatives available.[2] Accordingly, the Board Opposes the instant Motion and respectfully submits that it should be denied in its entirety.

Despite its opposition to the current Motion and to its issues being within the jurisdiction of the Court, the Board, as discussed during the status conference, is preparing a comprehensive study for the entire District that may result in a proposal to close, consolidate, or realign grades at one or more schools in the District.[3] The Board intends to complete such study in the Fall. Thereafter, the Board intends to continue working with Mr. Hefner to develop a comprehensive plan, which would be subject to this Court's review while the case is pending. That proposal may resolve concerns related to Fifth Ward.

## I.       Who Authorized Plaintiffs' Motion?

As noted above, it is entirely unclear who is actually a Plaintiff in this case. In 1963, over ninety (90) Plaintiffs (some with and without siblings represented by their parents) initiated the *Harris*

---

[2] Indeed, the demographer retained by Plaintiffs, Mr. William Cooper, has not mentioned *any* alternative considered by him other than reassignment of Fifth Ward Elementary students to LaPlace Elementary. He criticizes various plans the Board's demographer worked up but, as he stated in his report, Mr. Cooper presents the plan that he was asked to prepare. R. Doc. 220-5 at 2.

[3] Mr. Hefner describes the scope of work he will be performing related to this comprehensive study and development of a comprehensive plan for the District in his Report as well. Rebuttal Report of Michael C. Hefner, Exhibit 1 at 25-26.

litigation. Since that time, a review of the record appears to demonstrate that not once has there ever been a substitution of Plaintiffs. Assuming, *arguendo*, that some of these minor children were in kindergarten at the time of filing suit, they would have graduated sometime in or around 1976. The paper docket of the *Harris* litigation, at Record Document 13, shows no substitution at all. The paper docket ends in 1977.[4]

This litigation picked up again on the Record with the *Duhon* litigation on May 9, 1990.[5] On October 25, 1990, this Court consolidated the *Duhon* and *Harris* litigation.[6] The 1992 Consent Order is signed by counsel "for the *Harris* Plaintiffs."[7] This trend has only continued over the years. In 2021, Mr. Omavi Skukur withdrew from this case as counsel "for the *Harris* plaintiff class (original plaintiffs) in this matter."[8] In Plaintiffs' request for an "emergency status conference" last year, they again refer to themselves as "Private Plaintiffs, Hermon Harris, Jr., et al."[9] Notably, however, in the instant Motion, they only refer to themselves as "Plaintiffs."[10]

The original Plaintiffs in this case have long lost standing to litigate any issues before this Court. The lack of substitution is equally troubling because it appears that no actual Plaintiff has been litigating this case but, rather, their enrolled counsel have been doing so. Plaintiffs claim this is a class action and the Board acknowledges they did assert a class in the original 1963 Complaint. However, there appears to be no order of this Court that approved a class action or defined the class – a mandatory requirement of Rule 23. Undersigned counsel has requested that Plaintiffs' counsel provide a copy of the order approving a class action, including the class definition. Plaintiffs have not produced such an order as the time of this filing. The Board is in the process of obtaining the *Harris* paper

---

[4] See R. Doc. 13 at 8 (last entry on September 28, 1977).
[5] R. Doc. 1.
[6] R. Doc. 13 (.
[7] See R. Doc. 220-4 at 12.
[8] R. Doc. 184 at 1.
[9] R. Doc. 198 at 1.
[10] See, generally, R. Docs. 220 and 220-1.

docket files from the National Archives to determine whether such an order was ever issued. If not, this case very well may be moot.

In short, the Board has no idea who the actual Plaintiff and/or Plaintiff representatives are in this case. This is even more troubling given the three (3) public meetings that occurred at the beginning of this year related to Fifth Ward's potential closure. Over three (3) days, there was near unanimous opposition from the public to closure of the school. Indeed, over fifty (50) members of the public spoke in opposition to closures at those meetings.[11] At least one (1) of Plaintiffs' counsel of record were present at that meeting, Mr. Victor Jones. So, the question remains: If the overwhelming, nearly unanimous number of community members do not want the school closed and Plaintiffs' counsel are aware of such, then who are Plaintiffs' counsel representing when they file a motion to do so? If there is a class, do these divided opinions (whomever actually has the opinion to close the school) require the class to be divided into subclasses?[12]

## II.   This Court Lacks Subject Matter Jurisdiction Over Environmental Issues

Plaintiffs now seek to litigate in this desegregation case for the first time certain environmental issues. The Board submits that this Court does not have subject matter jurisdiction over these claims, regardless of Plaintiffs' protestations. As part of Plaintiffs' exhibits, they provide a copy of the 1963 complaint. A review of that complaint makes clear this case was about the prior *de jure* segregation of St. John the Baptist Parish schools, not environmental issues.

Paragraph VI of the 1963 Complaint states that the Board was "operating the public school system ... on a racially segregated basis."[13] Plaintiffs alleged that students, teachers, principals, and

---

[11] See Minutes of Public Meetings, Exhibit 2 at 2, 4, 6 (listing members of public who spoke at each meeting).
[12] See, *e.g.*, *Davis v. Bd. of Sch. Com'rs of Mobile Cnty.*, 483 F.2d 1017, 1020 (5th Cir. 1973) (noting that in a "lengthy hearing" about a school's site selection "there was no uniformity of views amongst the plaintiffs class" but not reaching the question of "whether the plaintiff class should have been divided into subclasses for the purpose of presenting the varying views on the question presented").
[13] R. Doc. 220-2 at 9.

professional personnel were assigned to schools on the basis of their race.[14] They also alleged that school construction, budgets, and school maintenance were all done based on "a compulsory biracial school system." And they allege that participation in extracurricular activities was limited based on race.[15]

Plaintiffs' requested relief was to permanently enjoin the operation of "a compulsory biracial school system" in this parish. Plaintiffs requested relief related to preventing: race based school zone lines; race based initial school assignments; assigning teachers, principals, or other professional personnel on the basis of race; approving employment contracts, budgets, and disbursing funds on the basis of race; school construction on the basis of race; determining participation in programming and supporting extracurricular activities on the basis of race; and, "any other distinctions in the operation of schools ... based solely on race or color."[16]

Nowhere in Plaintiffs' original Complaint was there any mention of alleged environmental issues. The reason seems clear; Plaintiffs' goal was the integration of schools, not the litigation of environmental issues. As Plaintiffs admit in their Motion, the Denka plant at issue was not built by DuPont until 1968, roughly five (5) years after this litigation began.

It is well established that "all questions of subject matter jurisdiction except mootness [are] determined as of the date of the filing of the complaint".[17] The Complaint from 1963 has nothing to do with environmental issues. This Court, clearly, has no jurisdiction over claims never before raised in over six decades of litigation.

---

[14] *Id.* at 9-10

[15] *Id.* at 10.

[16] R. Doc. 220-2 at 10-11.

[17] *Villafranca v. Pompeo*, 486 F. Supp. 3d 1078, 1082 (S.D. Tex. 2020) (citing *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005); *see also Burr v. Transohio Sav.*, No. 95-20144, 1995 WL 798590, at *2 (5th Cir. Dec. 27, 1995) ("The relevant date for determining whether a court has subject matter jurisdiction is the date on which the complaint is filed".)

Moreover, this Court previously noted that it doubted whether it would have jurisdiction to order coercive relief "for reasons not related to desegregation under the consent decree."[18] This Court further explained that "[a]ny motion seeking relief based on environmental concerns at Fifth Ward Elementary must not only identify the legal theory under federal law upon which a court could order the school board to close the school but also how that legal theory, which is grounded on environmental concerns, falls within the scope of the existing desegregation consent decree."[19] At the June 20, 2024 status conference, the Court repeated these concerns to the parties.

Even if this Court looks beyond the four corners of the complaint, which the Board submits is not necessary, the 1992 Consent Order also makes zero mention of any environmental issues. The 1992 Consent Order concerns, in short: faculty and staff assignment; student assignment inclusive of grade configurations and school zones; transfers and residency verification; facilities and construction; curriculum; and, reporting requirements. None of these areas deal with environmental issues.

Significantly, Plaintiffs *agreed* in 1992 to attendance zones that included Reserve Elementary School. It is not clear on the Record the exact date Reserve Elementary School was renamed to Fifth Ward Elementary School, but it may have been sometime around 1993. Regardless of the exact date, all parties and the Court in this litigation approved the student attendance zones and grade configurations in the 1992 Consent Order. There is absolutely no doubt that Plaintiffs were intimately aware of the location of the school and of the chemical plant at that time, yet no environmental concerns were asserted then. Next, the original *Harris* Plaintiffs lack standing to litigate environmental issues because none can establish an injury and fact. This Court previously noted "that standing would also likely be an obstacle to obtaining, as part of this case, the coercive relief suggested".[20] It noted that "[i]t would seem highly unlikely that any of them would have children

---

[18] Minutes, R. Doc. 202.
[19] Minutes, R. Doc. 204.
[20] Minutes, R. Doc. 202 at 2 n. 2.

attending FWE in 2023, and therefore no plaintiff in this lawsuit can claim the injury-in-fact necessary for standing to move for coercive relief not related to the consent decree."[21] The Board would submit that it is nigh impossible for the original *Harris* Plaintiffs to have children attending Fifth Ward Elementary because it has been over sixty (60) years since this litigation began. Nor can Plaintiffs articulate how a chemical plant that opened in 1968 caused any injuries in 1963. Thus, Plaintiffs' Motion must be denied for failure to state an injury in fact related to the Plaintiffs currently named in this litigation.

Lastly, how is a new environmental issue a *vestige* of the prior *de jure* segregated system? The United States Supreme Court has made clear that the scope of desegregation cases is limited to eliminating the vestiges of prior segregation. In *Missouri v. Jenkins*, the Supreme Court addressed, *inter alia*, a district court's order requiring remedies designed to increase minority student achievement.[22] However, that district court never "identified the incremental effect that segregation [ ] had on minority student achievement[.]" The Court reversed this requirement and explained that:

> Just as demographic changes independent of de jure segregation will affect the racial composition of student assignments so too will numerous external factors beyond the control of the KCMSD and the State affect minority student achievement. So long as these external factors are not the result of segregation, they do not figure in the remedial calculus.[23]

Here, these alleged environmental issues have no connection whatsoever to the prior *de jure* segregated system. Because there is no mention anywhere in the record of how these issues are connected to prior segregation, the burden falls to the Plaintiffs to prove it is a vestige.[24] They have, as explained above, utterly failed to prove that environmental issues are in anyway connected to the prior *de jure* segregated system. The plant at issue was not built until five (5) years after the original lawsuit was

---

[21] *Id.*
[22] 515 U.S. 70, 102 (1995).
[23] *Id.* at 102-103.
[24] *Cf. Tasby v. Estes*, 643 F.2d 1103, 1108 (5th Cir. 1981) ("the plaintiffs here have failed to meet their burden of proving that the administration of student discipline in the [school district] is motivated by a discriminatory purpose"). Just like discipline, environmental issues are not one of the traditional desegregation *Green* factors.

filed. And, again, Fifth Ward's current location was chosen decades into this litigation, and, even with knowledge of the location and potential environmental issues arising from the plant that were or should have been known, Plaintiffs consented to students going to it multiple times over the years. Plaintiffs "[i]nsistence upon [environmental air quality] goals unrelated to the effects of legal segregation unwarrantably postpones the day when the [Board] will be able to operate on its own."[25]

Next, the case law cited by Plaintiffs to claim that environmental issues belong in this desegregation case are clearly distinguishable even at a cursory glance. Plaintiffs broadly claim that a school facility that presents a "safety and health hazard" somehow means that environmental issues can be litigated in a desegregation case.[26] Notably, Plaintiffs cannot cite to a single case to show a school board is obligated to address *environmental* issues arising from a third-party source (outside of its control) rather than physical conditions of the buildings themselves. Plaintiffs are well aware that the issue of facilities has, for decades, dealt with comparing the physical conditions of schools to determine if they are comparable. Their presented case law does not change these standards.

While unitary status is not at issue here, the facilities standard is illuminating: Physical facilities should be deemed unitary when the school board has ensured, to the extent practicable, that its facilities are not amenable to racial identification simply on the basis of their physical condition. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18 (1971). The constitutional requirement with regard to facilities is to take corrective action to maintain facilities and the goal is to produce schools of "like" facilities, *Swann*, 402 U.S. at 18-19, with any differences in individual racially identifiable facilities, if such exist, being the result of non-race factors. *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 328 (4th Cir. 2001).

---

[25] *Missouri*, 515 U.S. at 102.
[26] Plaintiffs' Memorandum, R. Doc. 220-1 at 15.

Plaintiffs cite to *Mims v. Duval Cnty. Sch. Bd.*, 447 F.2d 1330, 1332-33 (5th Cir. 1971) to claim support for the position that Boards comply in good faith with "their obligations" related to "unsafe facilities" if they *consider* environmental issues in making school closure decisions. Plaintiffs conveniently omit that rather than any legal obligation, the school board there voluntarily proposed closing certain schools. One school's reason for closure included that it was "displeasing in terms of location" because of an incinerator, a polluted creek, sewage backing up, and the like.[27]. That closure was opposed by the plaintiffs in that case. The Fifth Circuit made clear that schools can be closed "for non-racial reasons."[28] The Fifth Circuit did not find an *obligation* to address these issues as part of that desegregation case but rather that "[t]here was no invidious discrimination in the closing ... the schools were closed for sound non-racial reasons."[29]

Plaintiffs also selectively quote from *Hill by and through Hill v. Greene County School District*, claiming that a hazardous "atmosphere" is somehow related to a facilities obligation. Once again, Plaintiffs leave out the full story of that case.[30] The *Hill* case was, notably, not a desegregation case. Rather, it was its own lawsuit brought by plaintiffs aggrieved over a school closure.[31] That board closed the school because "friable asbestos" in a school "pose[d] a serious health hazard."[32] Regardless, that case had nothing to do with facilities obligations in a desegregation case and, indeed, discussed factors for *issuing* an injunction rather than enforcing a desegregation decree.[33] Even though *Hill* was not a desegregation case, it analyzed whether a school was closed for race-based reasons or other reasons. Indeed, that court found that "financial embarrassment" lead to closure of the school rather than any racial animus because that board lacked funds to remediate the asbestos.[34] And, importantly, the

---

[27] *Mims*, 447 F.2d at 1332.
[28] *Mims v. Duval Cnty. Sch. Bd.*, 447 F.2d 1330, 1331 (5th Cir. 1971)
[29] *Id.* at 1333.
[30] 848 F. Supp. 697, 698 (S.D. Miss. 1994).
[31] *Hill By and Through Hill v. Greene Cnty. Sch. Dist.*, 848 F. Supp. 697, 698 (S.D. Miss. 1994)
[32] *Hill*, 848 F. Supp. at 698.
[33] *Hill*, 848 F. Supp. at 704.
[34] *Hill*, 848 F. Supp. at 706.

asbestos problem was one within the actual school facilities and not one of general environmental concern arising from outside the board's control.

Next, Plaintiffs claim that *Davis v. Board of School Commissioners of Mobile County*, somehow establishes facilities "equalization obligations" with respect to school site selection.[35] First, there is no obligation to "equalize" facilities across a school district.[36] Second, that board *chose* not to build a school in an undesirable location. The plaintiffs in that case actually fought the school site selection and demanded a site that a committee determined was closer to an industrial area, rather than the chosen site that "eliminated the possibility of ever having heavy polluting industries nearby."[37] Those plaintiffs' objections were rejected because there was no racial discrimination in the site selection, nor was there an unlawful burden placed on black students related to transportation.[38] Notably, when it came to school site selection, the Fifth Circuit explained that "it is not ordinarily justiciable but are left to the public officials in charge."[39] Site selection controversies "are justiciable, however, in the context of racial discrimination."[40]

Of note in this case, Fifth Ward's site selection was decades ago, and Plaintiffs consented to it in the 1992 Consent Order. Even more recently, Plaintiffs did not oppose Fifth Ward's grade reconfiguration in 2017, which made it a Pre-K to 4th grade school in the same location.[41] Plaintiffs alleged in their Motion that "[s]ince at least 2016, significantly elevated levels" of chemicals in the air have been detected.[42] Yet, they did not oppose the Board's Motion a year later to reconfigure Fifth Ward. As noted below, Plaintiffs commissioned one of their experts in 2021. Thereafter, Plaintiffs, in their prior motion for an "emergency" status conference, stated that their counsel held community

---

[35] 483 F.2d 1017 (5th Cir. 1973).
[36] As noted above, the goal is to produce schools of "like" facilities. *Swann*, 402 U.S. at 18-19.
[37] *Davis v. Bd. of Sch. Com'rs of Mobile Cnty.*, 483 F.2d 1017, 1019-20 (5th Cir. 1973)
[38] *Davis*, 483 F.2d at 1021-22.
[39] *Id.*
[40] *Id.*
[41] Order, R. Doc. 155.
[42] Plaintiff's Memorandum, R. Doc. 220-1 at 1.

meetings in April 2023.[43] They also admitted that "discussion among the parties concerning closure of Fifth Ward Elementary began in early May 2023."[44] If environmental air quality issues are part of this case, why did it take so long to litigate? Because they are not part of the case at all.

In sum, environmental issues are far beyond the control of the Board and beyond the scope of this desegregation case. This Court should not allow Plaintiffs to raise such environmental issues for the first time in a sixty-one year old case designed to dismantle prior *de jure* segregated schools.

## III.    Issues Surrounding Denka Subject to Multiple Lawsuits

Plaintiffs make no mention in their motion of the multiple lawsuits that have occurred and/or are still ongoing related to environmental issues at Denka. As the Court may be aware, Denka has been facing scrutiny from private community lawsuits as well as the EPA. At least four (4) recent federal lawsuits have been identified by undersigned counsel, two (2) of which are still ongoing and one that has been stayed. These are the cases where the environmental issues caused by the Denka plant should be handled if legally cognizable at all.

### A.    Acosta v. Denka Performance Elastomer

In *Acosta v. Denka Performance Elastomer*, the court held that Plaintiffs failed to state a specific standard of care under Louisiana law and thus failed to identify any legal duty that Dupont or Denka breached.[45] In 2020, twenty-three (23) residents of St. John the Baptist Parish filed suit against numerous defendants, which were whittled down to Denka and Dupont. They were alleging neoprene production at the plant exposed them to unsafe levels of chloroprene and other hazardous pollutants.[46] Notably, this is the same claim presented by Plaintiffs in this case in their Motion to close Fifth Ward Elementary.

---

[43] R. Doc. 198 at 11.
[44] *Id.* at 12.
[45] No. 22-30570, 2023 WL 2770825, at *3 (5th Cir. 2023).
[46] *Id.* at *1.

The district court dismissed the claims against Dupont as time barred and dismissed those against Denka for failure to state a claim.[47] The plaintiffs appealed and, while their appeal was pending, a case filed against the same defendants alleging nearly identical claims was decided.[48] The court in this identical case held that almost all of the plaintiff's claims must be dismissed.[49] Following that court's holding, the *Acosta* court similarly held that none of the plaintiff's alleged claims survive Louisiana law. First, those plaintiffs failed to allege "*any* standard of care beyond generalized notions of reasonableness[.]"[50] Second, those plaintiffs failed to allege "any specific duty" that Denka violated, so their claims could not survive as a custodial/strict liability claim.[51] Thus, as a result, those plaintiffs' claims were dismissed in 2023 for failing to allege a cognizable claim under Louisiana law.[52]

## B.    United States of America v. Denka Performance Elastomer LCC

In *United States of America v. Denka*, the United States filed a complaint in February 2023, alleging that Denka Facilities' emissions present an imminent and substantial danger to public health and welfare.[53] The United States is seeking injunctive relief requiring Denka to immediately reduce its emissions to levels that no longer cause or contribute to an unacceptable high cancer risk to communities surrounding the area.[54] Denka filed an answer to the Complaint alleging numerous counterclaims and affirmative defenses.[55] A motion later granted by the Court dismissed Denka's counterclaims and first six affirmative defenses because the court did not have subject matter jurisdiction over the claims.[56] After numerous motions, that court has still yet to make a determination

---

[47] *Acosta*, 2023 WL 2770825, at *1.

[48] *Id.*

[49] *Id.* at *2.

[50] *Id.* at *2.

[51] *Id.* at *3.

[52] *Id.* at *3.

[53] Complaint at 1, *United States of America v. Denka Performance Elastomer LCC*, No. 2:23-CV-00735 (E.D. La. filed Feb. 28, 2023), ECF No. 1.

[54] *Id.* at 1-2.

[55] Answer to Complaint, *United States of America v. Denka Performance Elastomer LCC*, No. 2:23-CV-00735 (E.D. La. filed Mar. 28, 2023), ECF No. 22.

[56] Order and Reasons, *United States of America v. Denka Performance Elastomer LCC*, No. 2:23-CV-00735 (E.D. La. filed Aug. 30, 2023), ECF No. 90.

on the claim for injunction sought by the United States of America. In the meantime, EPA issued a Final Rule that, as noted below, imposed new emissions requirements on Denka. A status conference was held on July 17, 2024, to discuss the impact of the Final Rule.[57] Judge Barbier held that case in abeyance because the Final Rule may impact that lawsuit and the possibility that Denka may close if it is unable to get a stay of the new rule or some type of extension.[58]

### C.      Denka Performance Elastomer LLC v. EPA (D.C. Circuit)

Next, Denka brought suit against EPA in the D.C. Circuit earlier this year. In *Denka v. EPA*, Denka raises the issue that the EPA's new rule requires Denka to meet a comprehensive slate of capital-intensive emission control requirements in only ninety days, when it claims other industries producing more harmful emissions get two years.[59] Further, Denka filed a motion to seek a stay pending review of the ninety-day deadline rule as Denka is suffering irreparable harm because of the need to immediately react to the Rule's requirements.[60] EPA then filed a response to the stay stating that Denka's motion does not argue that Denka would likely succeed on the merits of any of the attacks on the underlying rule.[61] On the same day, a motion for leave to intervene was filed by: Concerned Citizens of St. John, Rise St. James Louisiana, Louisiana Environmental Action Network, Texas Environmental Justice Advocacy Services, Air Alliance Houston, California Communities Against Toxics, Environmental Defense Fund, Environmental Integrity Project, and Sierra Club.[62]

---

[57] Order, *United States of America v. Denka Performance Elastomer LCC*, No. 2:23-CV-00735 (E.D. La. filed July 10, 2024), ECF No. 177.

[58] Minute Entry, *United States of America v. Denka Performance Elastomer LCC*, No. 2:23-CV-00735 (E.D. La. filed July 10, 2024), ECF No. 179.

[59] Denka Emergency Motion for Stay Pending Review at 15, *Denka Performance Elastomer LLC v. EPA*, No. 24-1135 (D.C. Cir. 2024).

[60] *Id.* at 16.

[61] Respondents' Opposition to Motion to Stay Final Rule at 5, *Denka Performance Elastomer LLC v. EPA*, No. 24-1135 (D.C. Cir. 2024).

[62] Motion for Leave to Intervene Filed at 1, *Denka Performance Elastomer LLC v. EPA*, No. 24-1135 (D.C. Cir. 2024).

Those movants argue that members "live, work, and recreate" in communities near these facilities and are exposed to the air pollutants that are emitted.[63]

That court ordered that the motion to intervene be granted.[64] A month later, the motion to stay filed by Denka was denied.[65] That litigation is still on-going as of the date of this filing.

### D.    Denka Performance Elastomer v. EPA (Fifth Circuit)

Yet, the Denka saga continues now in the Fifth Circuit. On June 27, 2024, Louisiana's Department of Environmental Quality extended to Denka a two-year extension to comply with the EPA's new rule. However, the EPA determined that the state action is "ineffectual," and Denka brought suit in the Fifth Circuit with a petition for review on July 11, 2024. Denka claimed that "The [EPA] and its Administrator have embarked on a politically motivated, unscientific crusade to shut down [Denka]."[66]

Not unexpectedly, Denka filed a motion to stay stating that the EPA rule would require Denka to perform numerous tasks to reduced emissions within an impossible 90 day timeline.[67] A motion to intervene was then filed by the Louisiana Department of Environmental Quality (LDEQ) in support of Denka.[68] LDEQ in this motion stated that the Final Rule sets an unrealistic deadline for compliance since it required all new controls to be implemented only a mere five months after the rule was promulgated.[69] The Fifth Circuit granted the intervention on July 19, 2024. Pending before the Court

---

[63] *Id.* at 2-3.

[64] Clerk's Order Filed Granting Motion for Leave to Intervene at 1, *Denka Performance Elastomer LLC v. EPA*, No. 24-1135 (D.C. Cir. 2024).

[65] Per Curiam Order Filed Denying Motion to Stay Case at 1, *Denka Performance Elastomer LLC v. EPA*, No. 24-1135 (D.C. Cir. 2024).

[66] Petition for Review at 11, *Denka Performance Elastomer v. EPA*, No. 24-60351 (5th Cir. July 11, 2024), ECF 1.

[67] Motion for Stay Pending Appeal at 5, *Denka Performance Elastomer v. EPA*, No. 24-60351 (5th Cir. July 11, 2024), ECF 6.

[68] Motion to Intervene at 3, *Denka Performance Elastomer v. EPA*, No. 24-60351 (5th Cir. July 15, 2024), ECF 11.

[69] *Id.*

is EPA's motion to dismiss for lack of jurisdiction, which also incorporated responses to the stay request filed by Denka.[70]

In sum, the tale of Denka and the lawsuits surrounding it are a tangled thicket this Court should not wade into. These lawsuits demonstrate the complexity of the alleged environmental issues that Plaintiffs now seek to drag into this school desegregation case. Dozens of parties have been or are involved in those cases that have raised a variety of arguments under both state and federal law about environmental issues. At least three (3) separate federal courts have pending litigation where the air quality around the Denka facility is being litigating, including the one by the United States which claims the air quality is unreasonably dangerous (which Denka disputes). Also being litigated is how long Denka has to comply with the new EPA Final Rule to remedy the situation. It would not be in the interest of judicial efficiency for a fifth federal court to become entangled in the same issue, particularly if the hearing on that matter converts a school desegregation case into an environmental case requiring substantial discovery and scientific testimony.

It should also be remembered that, even if granted by this Court, Plaintiff's motion would only move the Fifth Ward Elementary students a bit further away from Denka for approximately seven (7) hours each school day. For those students who live near Denka, the other seventeen (17) hours of school days, and, for all twenty-four (24) hours of days that school is not in session, those students living near the Denka facility would continue to be exposed to allegedly dangerous air quality.[71] This makes it clear that the proper remedy is not to bus the students, rather, it is instead to let the issues between EPA and Denka be resolved with respect to improving air quality to meet new standards. Those remedies are already being sought in pending litigation and with the new EPA Rule that was issued.

---

[70] Motion to Dismiss Petition for Review for Lack of Jurisdiction. *Denka Performance Elastomer v. EPA*, No. 24-60351 (5th Cir. July 15, 2024), ECF 42.
[71] See also, Hefner Report, Exhibit 1 at 28 (same).

**IV.      Even if the Court gets to the Merits, Plaintiffs' Plan is Not Beneficial to Desegregation**

Regardless of environmental issues, which this Court should avoid, Plaintiffs' proposed relief is not beneficial to desegregation. The Board's demographer and expert has reviewed Plaintiffs' proposed plan and explains that Plaintiffs' expert, Mr. Cooper, focuses solely on one thing: closing Fifth Ward and moving those students to LaPlace Elementary School.[72] Plaintiffs fail to account for whether any additional changes to other schools would benefit, or harm, the District. Additionally, Plaintiffs' plan has a hidden ulterior motive: closing East St. John Prep in addition to Fifth Ward. Plaintiffs' plan eliminates St. John Prep's feeder school and makes no mention of whether students would continue to go to St. John Prep for grades 5-8 or stay at LaPlace Elementary.

First, Plaintiffs' plan is a simple one: close Fifth Ward and move all students to LaPlace. Mr. Hefner explains that this increases the Black demographics at the school by 2.5% and decreases the White percentage by 1.6%. While not large swings, this "moves the District backwards in their student desegregation efforts."[73]

As the Court may be aware, when it comes to student assignment, courts look to district student demographics to determine the extent of desegregation in a school district. The Supreme Court has approved "limited use ... of mathematical ratios" by district courts.[74]  Importantly,

> Constructing a unitary school system does not require a racial balance in all of the schools. *Swann*, 402 U.S. at 24, 91 S.Ct. at 1280, 28 L.Ed.2d at 571; *Horton v. Lawrence County Bd. of Educ.*, 578 F.2d 147, 151 (5th Cir.1978) (per curiam); *United States v. Bd. of Educ.*, 576 F.2d at 39. What is required is that every reasonable effort be made to eradicate segregation and its insidious residue.[75]

---

[72] Hefner Report, Exhibit 1 at 17.
[73] Hefner Report, Exhibit 1 at 15.
[74] *Swann*, 402 U.S. at 25.
[75] *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 227–28 (5th Cir. 1983)

Some courts have applied a plus or minus (+/-) 15 percentage point deviation from district wide Black student demographics.[76] Others have approved a +/-20% standard.[77] In this case, there does not appear to be a specific standard approved by this Court with respect to student assignment. Plaintiffs' make no attempt to compare the District's schools to any appreciable standard when arguing for Fifth Ward's closure. Nevertheless, as explained below, the Board's schools are close to or exceed acceptable standards.

If a +/-15% standard is used for student assignment, nearly all of the District's schools meet that standard. Mr. Hefner shows demographic deviations in his Table 7:[78]

| St. John the Baptist Public School System SY2023-2024 School Enrollments by Race | | | | | | | | | Black Deviation | White Deviation |
|---|---|---|---|---|---|---|---|---|---|---|
| School | Grades | Total | White | % White | Black | % Black | Other | % Other | | |
| East St. John High School | 9-12 | 1,311 | 114 | 8.7% | 945 | 72.1% | 252 | 19.2% | 0.2% | -0.3% |
| LaPlace Elementary School | PK-8 | 723 | 58 | 8.0% | 529 | 73.2% | 136 | 18.8% | 1.3% | -1.0% |
| East St. John Preparatory Academy | 5-8 | 342 | 15 | 4.4% | 274 | 80.1% | 53 | 15.5% | 8.2% | -4.6% |
| West St. John High School | 8-12 | 188 | 0 | 0.0% | 182 | 96.8% | 6 | 3.2% | 24.9% | -9.0% |
| West St. John Elementary School | PK-7 | 206 | 0 | 0.0% | 205 | 99.5% | 1 | 0.5% | 27.6% | -9.0% |
| Fifth Ward Elementary School | K-4 | 313 | 16 | 5.1% | 238 | 76.0% | 59 | 18.8% | 4.1% | -3.9% |
| Lake Pontchartrain Elementary School | PK-8 | 770 | 18 | 2.3% | 543 | 70.5% | 209 | 27.1% | -1.4% | -6.7% |
| John L. Ory Communications Magnet Elementary | K-8 | 413 | 139 | 33.7% | 223 | 54.0% | 51 | 12.3% | -17.9% | 24.7% |
| Garyville/Mt. Airy Math & Science Magnet Schl. | PK-8 | 325 | 18 | 5.5% | 255 | 78.5% | 52 | 16.0% | 6.6% | -3.5% |
| Emily C. Watkins Elementary | PK-8 | 498 | 82 | 16.5% | 263 | 52.8% | 153 | 30.7% | -19.1% | 7.5% |
| **Totals** | | **5,089** | **460** | **9.0%** | **3,657** | **71.9%** | **972** | **19.1%** | **0.0%** | **0.0%** |
| Notes: Enrollment Counts from Louisiana Department of Education SY2023-24 MFP Counts | | | | | | | | | | |
| Does not include Central Office Students | | | | | | | | | | |

This table demonstrates that of ten (10) schools, six (6) meet a +/-15% standard. The exceptions are the West Bank elementary and high school, which are geographically isolated by the Mississippi River. John L. Ory Magnet is -17.9% Black; however, that school is a magnet school with controlled admissions requirements set by Court Order. Finally, Emily C. Watkins is +19.1% Black. Of note, if a +/-20% standard is applied, only the West Bank schools do not meet a +/-20% demographic goal.

Importantly, Fifth Ward Elementary is +4.1% Black, well within any possible demographic goal.

---

[76] *Borel on behalf of AL v. Sch. Bd. St. Martin Par.*, 44 F.4th 307, 314 (5th Cir. 2022); *Everett v. Pitt Cnty. Bd. of Educ.*, 788 F.3d 132, 147 (4th Cir. 2015).

[77] *Manning v. Hillsborough County School Board*, 244 F.3d 927, 935 (11th Cir.2001).

[78] Hefner Report, Exhibit 1 at 11.

In essence, Plaintiffs demand that this Court close a school that is already desegregated. This clearly violates established desegregation precedent. In the St. Martin desegregation case, the Fifth Circuit addressed a situation where a district court closed Catahoula Elementary, a predominantly white school. The Fifth Circuit explained that:

> Although we are mindful of the discretion afforded to the district court's choice of equitable remedy, "school closures ... as desegregation techniques require careful scrutiny." *CRUCIAL*, 722 F.2d at 1189; *see also Valley I*, 646 F.2d at 940. Indeed, "[t]he closing of a facility built and maintained at the expense of local taxpayers is a harsh remedy, which should only be employed if <u>absolutely necessary</u> to achieve the goal of a unitary system after all other reasonable alternatives have been explored." *Valley I*, 646 F.2d at 940.[79]

There, the Fifth Circuit noted that closing Catahoula Elementary Schol "would not create immediate compliance with the +/-15% variance" agreed in that case at the schools those children would be sent. Because "closure would not immediately resolve racial imbalances, the district court should have considered other '[e]qually effective alternatives' before imposing the drastic remedy."[80] The Fifth Circuit noted that, while rezoning would have a positive impact on desegregation ,the school was making "slow-but-steady progress" on its own because of demographic changes, such as Black students moving into that attendance zone.[81] Ultimately, the Fifth Circuit reversed that closure because that district court "ignored other potentially workable and feasible proposals, jumping ahead to the most extreme remedy. Such a decision contravenes our guidance."[82]

Here, Plaintiffs' proposal has <u>no</u> benefit for desegregation. And Plaintiffs make little effort to justify it from the lens of desegregation, rather spilling significant ink (including voluminous and technical expert reports) on the alleged environmental issues which are beyond the Board's control. Indeed, they focus on distances to Denka's plant and travel times around it rather than desegregation

---

[79] *Borel on behalf of AL v. Sch. Bd. St. Martin Par.*, 44 F.4th 307, 316 (5th Cir. 2022) (emphasis supplied).
[80] *Id.*
[81] *Id.* at 317.
[82] *Id.*

of schools. They argue that "relocation to LaPlace Elementary would place Fifth Ward Elementary in school facilities away from Denka, thereby significantly reducing exposure to chloroprene."[83] What about the primary purpose of this case, desegregation? What is lost in Plaintiffs' environmental diversion[84] is what this case is about – desegregation of the District's schools.

As noted, above, facility obligations include, *inter alia*, whether schools are comparable to each other or if the physical conditions of the school indicate it is a school is for students one race or another.[85] Of note, the only "comparison" Plaintiffs have is how far schools are from Denka. This is a wholly inappropriate analysis in the context of desegregation. Indeed, as Plaintiffs argue, Fifth Ward was built roughly thirty (30) years ago. They make no other comments on the physical condition of Fifth Ward, despite having done a thorough site visit of that school and all other East Bank elementary schools in 2023 (and for some reason they claim in their discovery requests they need to now do another site visit/inspection). Of course, that is the point of Plaintiffs' Motion: they don't want to address actual desegregation issues but only care about their newly raised environmental concerns.

### A.   Plaintiffs Actually Want to Close Two Schools

Perhaps most alarming about Plaintiffs' proposal is that they actually want to close two (2) schools rather than one. Fifth Ward and East St. John Preparatory Academy share the same attendance zone.[86] Fifth Ward serves students in grades Pre-K to 4; East St. John Prep serves Fifth Ward students as they matriculate into grades 5 to 8. Plaintiffs utterly fail to discuss or even reference "the assignment of grades 5-8 in the Fifth Ward/E. St. John Prep attendance zone[.]"[87]

Indeed, how can Plaintiffs legitimately present a plan that closes a feeder school (Fifth Ward) without discussing in any way the impact on the school it feeds into (St. John Prep)? It is because they

---

[83] Plaintiffs' Memorandum, R. Doc. 220-1.
[84] The Board takes the health and safety of its students seriously; however, the Board takes no position at this time on the merits of Plaintiffs environmental arguments because they do not belong in this case.
[85] *Swann*, 402 U.S. at 18-19.
[86] Hefner Report, Exhibit 1 at 14.
[87] *Id.*

want that school closed as well. Or, as stated by Mr. Hefner, "[t]he absence of that discussion reasonably leads one to the conclusion that LaPlace will take all students in grades PK-8."[88] Indeed, Mr. Roseman states on behalf of Plaintiffs that "East St. John Preparatory Academy [is] unsuitable for occupancy."[89] Their own expert reveals their hidden motive. Notably, St. John Prep is a desegregated school having Black student demographics within 8.2% of the parish wide Black student percentage. Once again, Plaintiffs' purpose has nothing to do with desegregation and is far afield from any appreciable desegregation standards.

Moreover, what happens to East St. John High School, the District's largest school, given Plaintiffs' hidden motives? By road, East St. John High is only 1.2 miles from East St. John Prep. Measuring distance from Denka, East St. John High is slightly more than a half mile or so further from Denka than East St. John Prep. If East St. John Prep is "unsuitable for occupancy" as Plaintiffs' expert contends, is East St. John High "suitable" because it is a half mile further from Denka? Where do you draw the line? This demonstrates yet again another reason why environmental issues have no place in this desegregation suit.

## B.   Environmental Experts Sprung on the District, if a Hearing is Set Discovery is Required

Plaintiffs' Motion is the first time the Board became aware of Plaintiffs' new experts Dr. Adrienne Katner and Mr. Jerry Roseman, both of whom have submitted lengthy reports on the dangers of chloroprene and/or the "suitability" of occupying Fifth Ward and East St. John Prep. The Board was provided no notice by Plaintiffs that new experts would be offer by Plaintiffs related to these issues. If the Court sets a hearing, fairness demands that the Board be allowed to conduct its own discovery, time to consider retaining its own experts about matters outside the scope of desegregation, and any necessary depositions.

---

[88] *Id.*
[89] Roseman Declaration, R. Doc. 220-11 at 55.

As the Court is aware, desegregation cases are unlike other types of cases in that there is not a standing scheduling order governing discovery timelines. However, Plaintiffs have had these experts waiting in the wings for years without informing the Board or its counsel. Dr. Katner states that she was "commissioned" by Plaintiffs' counsel in <u>2021</u>.[90] It is not clear when Mr. Roseman was retained by Plaintiffs. Even so, it is clear that Plaintiffs have been preparing to litigate these environmental issues for years should the Board not capitulate to their demands to close Fifth Ward.[91] In contrast, the Board has had roughly six (6) weeks to respond to Plaintiffs' Motion including these surprise experts.

It is fundamentally unfair to force the Board to litigate issues that not only don't belong in this case but are also subject of newly raised environmental issues dealing with highly technical and complicated scientific matters that are not only beyond the scope of this case but are beyond the control of the Board. If the Court sets this matter for a hearing, which the Board maintains it should not, the Board respectfully requests that a scheduling order should issue to allow proper discovery to be conducted.

## V.     Board Objects to Plaintiffs' Discovery

That said, the Board vehemently objects to the discovery recently propounded on it by Plaintiffs. Plaintiffs' Motion and statements to the Court at the June status conference indicated that they were seeking "limited discovery concerning the instant Motion."[92] Plaintiffs offered no other specifics to the Board or the Court at that time, but counsel assumed the truth of such statement. Thus, Board counsel indicated they would accept service but reserved the right to object. The Board submits that the Court was blatantly mislead by Plaintiffs' counsels' representations and that they did

---

[90] Dr. Katner Declaration, R. Doc. 220-7 at 2.
[91] As noted above, Plaintiffs have admitted discussions about closing Fifth Ward did not start between the parties in this case until May 2023.
[92] R. Doc. 220-1 at 25.

not heed in any way the Court's admonition to not undergo a "fishing expedition." Plaintiffs' discovery is egregiously obscene in its scope and covers virtually *all* aspects of this litigation, not just "the instant Motion." This Court should rescind its authorization to Plaintiffs to conduct discovery because of their misrepresentations or, at least, severely limit the scope of their discovery to that which was originally authorized by the Court. Though the Board maintains there should be no discovery about issues outside the scope of this litigation.

Plaintiffs' discovery is attached to this Opposition, and the briefest review clearly evidences Plaintiffs' misrepresentations. Interrogatory 1 asks for the Board to "[i]dentify each person who has knowledge concerning any decision or action proposed to, proposed by, or taken by, the Board to comply with the Orders."[93] However, Plaintiffs definitions show the true scope of this interrogatory:

"The Orders" means and refers each and all of the following:

a) That certain June 21, 1965 Order of the District Court in *Harris v. St. John the Baptist Parish School Board*;

b) That certain November 4, 1965 Order of the District Court in *Harris v. St. John the Baptist Parish School Board*;

c) That certain December 29, 1966 Fifth Circuit Order in *United States v. Jefferson Cnty. Bd. of Educ.*, 372 F.2d 836 (5th Cir. 1966), *aff'd on reh'g*, 380 F.2d 385 (5th Cir. 1967);

d) That certain July 7, 1967 Order of the District Court in *Harris v. St. John the Baptist Parish School Board*;

e) That certain July 18, 1969 Order of the District Court in *Harris v. St. John the Baptist Parish School Board*, annexed as Ex. 2 to Pl.'s Mot. for Further Relief dated June 12, 2024 (Doc. 220-3);

f) That certain December 1, 1969 Fifth Circuit Order in *Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211, 1218 (5th Cir. 1969), *rev'd on other grounds sub nom. Carter v. W. Feliciana Par. Sch. Bd.*, 396 U.S. 290 (1970); and,

g) That certain November 20, 1992 Consent Order entered by the District Court in *Harris v. St. John the Baptist Parish School Board*, see Doc. 53 and annexed as Ex. 3 to Pl.'s Mot. for Further Relief dated June 12, 2024 (Doc. 220-4).[94]

---

[93] Exhibit 3 at 4.
[94] *Id.* at 2-3.

What relevance does compliance with orders between 1965 and 1992 have to do with Plaintiffs' Motion to close Fifth Ward for environmental reasons, when no order of this Court references environmental issues? Plaintiffs' Requests for Production fair no better in their scope (which have the same definitions). For example, Plaintiffs demand that the Board:

6. Produce each copy of any of the Orders that was provided at any time to the Board, together with documents sufficient to disclose the date or dates on which such copy was provided to and considered by the Board.

7. Produce all documents concerning any decision or action proposed to, proposed by, or taken by, the Board to comply with the Orders. ...

9. Produce each document or communication in the possession, custody or control of the Board from 1968 to the present concerning:

(a) Health risks presented by exposure to chloroprene;

(b) Any risk or danger to nearby schools posed by the plant formerly operated by DuPont and currently operated by Denka; and

(c) The indoor and outdoor air quality of Fifth Ward Elementary ...

11. Produce documents sufficient to disclose the history of each of the sites on which Fifth Ward Elementary School, East St. John Preparatory Academy, and LaPlace Elementary School is located with regard to:

(a) Whether, and, if so, for what period of time, and in what way, a facility on each site was de jure segregated;

(b) All efforts made by the Board from 1963 to the present to eliminate vestiges of the dual system at each site where a de jure segregated school existed;

(c) The racial composition of each school located on each site, annually, from 1963 to the present;

(d) The history, cost, and description of each of the facilities located on each site from 1963 to the present;

(e) All factors considered by the Board in choosing to build each of the present schools on its present site.[95]

---

[95] Exhibit 3 at 5-6.

Far from the "limited discovery" they represented to this Court, Plaintiffs are trying to reopen issues that have long been settled, including the site selections of various District schools, which Plaintiffs *consented to* in the 1992 Consent Order.

Similarly, Plaintiffs have propounded 30(b)(6) notices that only continue to all-encompassing nature of their discovery, attached as Exhibit 4. They want the Board to produce someone to testify about any and all efforts in this desegregation case from 1963 to present day. In addition to that 30(b)(6) notice, Plaintiffs have noticed <u>fifteen (15)</u> individual depositions, attached as Exhibit 5. These sixteen (16) deposition notices clearly exceed the ten (10) deposition limit of Rule 30. Plaintiffs have not asked the Board to consent to more than ten (10) depositions (which it does not). Nor have they asked for leave of court to take more than ten (10) depositions, as required by Rule 30(a)(2)(A)(i).

Plaintiffs told this Court on June 20, 2024, that they were seeking "limited discovery" in this case, but a simple review of their discovery that was actually propounded on the Board demonstrates that was not true. Because that discovery is part of Plaintiffs' Motion, the Board now objects in this Opposition. The vast majority of the discovery requests are in no way relevant to present day environmental issues (which are beyond the scope of this case). The Court should reconsider its prior authorization of discovery now that the true scope of Plaintiffs discovery has been unmasked. While no discovery should be issued on matters outside the scope of this case, this Court should either rescind its prior authorization or severely limit Plaintiffs' discovery.

## CONCLUSION

For the forgoing reasons, St. John the Baptist Parish School Board submits that the Court should deny Plaintiffs' Motion. Additionally, the Court should reconsider its decision at the status conference to grant discovery. Lastly, the Board would again assure the Court that it is undertaking a comprehensive study which will avoid temporary and piecemeal student assignment decisions.

**Respectfully submitted**, this the 25th day of July 2024.

**ST. JOHN THE BAPTIST PARISH SCHOOL BOARD**

**HAMMONDS, SILLS, ADKINS, GUICE, NOAH & PERKINS, LLP**
2431 S. Acadian Thruway, Suite 600
Baton Rouge, LA 70808
Telephone (225) 923-3462
Facsimile (225) 923-0315

*/s/ John R. Blanchard*
**Robert L. Hammonds**
Louisiana Bar No. 6484
**Wayne T. Stewart**
Louisiana Bar Roll No. 30964
**Pamela Wescovich Dill**
Louisiana Bar No. 31703
**John Richard Blanchard**
Louisiana Bar No. 37036
**Timothy J. Riveria**
Louisiana Bar No. 39585
**John Scott Thomas**
Louisiana Bar No. 22635