UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KATHY R. DUHON, ET AL. | CIVIL ACTION |
| VERSUS | NO: 90-1669 |
| ANN T. TATJE, ET AL. | |
| | CONSOLIDATED WITH |
| HERMON HARRIS, JR., ET AL. | NO. 13,212 |
| VERSUS | |
| ST. JOHN THE BAPTIST PARISH SCHOOL BOARD | SECTION: "A" |

## ORDER AND REASONS

The following motion is before the Court: **Motion for Authorization to Close Fifth Ward Elementary and to Operate Early College Option Program (Rec. Doc. 241)** filed by the St. John the Baptist Parish School Board ("the Board"). The NAACP Legal Defense and Educational Fund, Inc. ("the LDF") and local counsel, Mr. Gideon Carter, have filed an opposition on behalf of "Plaintiffs."[1] The United States, as plaintiff-intervenor in the case, has no objection to the Board's motion. The motion, submitted

---

[1] "Plaintiffs" refers to the original plaintiffs (Hermon Harris, Jr., et al. ) from a desegregation case that was first initiated in 1963—over 61 years ago. The purpose of the Harris case was to challenge and dismantle the prior de jure segregated school system in the parish.
The efforts in Harris were successful and resulted in certain consent decrees/orders that remain in effect today. No person who was a plaintiff in the 1963 case is participating in the matters currently before the Court, and given that no new plaintiff has been added to the Harris case since 1963, the LDF does not represent any actual plaintiff in this lawsuit. Therefore, the Board questions the propriety of the LDF filing an opposition to its motion.

for consideration on April 30, 2025, is before the Court on the briefs without oral argument.

I.

Since July of 2023, the LDF on behalf of "Plaintiffs" (see note 1 above) has been seeking this Court's intervention to compel the Board to close the Fifth Ward Elementary School ("FWE") in light of its proximity to the Denka Performance Elastomer plant. The LDF maintained that the plant emits unacceptably dangerous levels of chloroprene into the surrounding air, and given that FWE is a predominately black school located a mere half-mile from the plant, the FWE school facility constituted an inferior and unequal facility. The Denka plant was built after the school was already located at its current site so the LDF's theory was that by continuing to operate the school at its current site, the Board was in violation of the various desegregation orders/decrees entered in resolving the Harris case.[2]

Recently, for reasons unrelated to FWE's proximity to the Denka plant, the Board adopted a plan to close FWE, and to reassign its students between East St. John Prep and LaPlace Elementary School.[3] The Board's plan would reconfigure East St. John Prep into a PK-8 school (currently a 5th-8th grade school), and rename East St. John Prep to Fifth Ward Preparatory School. The Board's plan also includes modifying attendance zones for East St. John Prep, LaPlace Elementary School, and Emily C.

---

[2] Again, the Denka plant was built after the school was already located at its current site. Thus, if the FWE facility was in fact inferior and unequal because of its proximity to the Denka plant, it only became so due to the actions of a private entity over which the Board had no control.

[3] The Board explained that it is closing the school of its own initiative following a comprehensive study for the entire school district.

Watkins.[4] The Board has filed the instant motion seeking this Court's authorization to implement its plan.[5]

In June of 2024, the LDF filed a Motion for Further Relief, Discovery, and Evidentiary Hearing (Rec. Doc. 220, Motion), in which it sought an order from the Court to compel the Board to close the FWE school and reassign all of the school's students to LaPlace Elementary. Before the Court was able to issue its ruling on that motion, the Board had voted to close FWE at the end of the 2024-25 school year, thereby mooting for the most part the relief that the LDF was seeking in its motion. (Rec. Doc. 236, Status Report). The Board did not adopt the LDF's preferred reassignment plan, which was to reassign all of FWE's students to LaPlace Elementary, but the issue of whether the Board's reassignment plan, which included reassigning some students to East St. John Prep School, was problematic was not an issue before the Court at that time. (Rec. Doc. 237, Order and Reasons at 11).

But even if some aspect of the LDF's motion had survived mootness, the Court explained why it nonetheless lacked subject matter jurisdiction to proceed to act on the motion because the LDF had filed a motion seeking coercive relief against the Board without having an actual plaintiff before the Court. (*Id.*) Implicit in the requirements for Article III standing, which is necessary to subject matter jurisdiction in federal court, is that there be a plaintiff on whose behalf relief is being sought. (*Id.* at 12). Given that the

---

[4] The Board advises that no students are impacted by the modification of the Emily C. Watkins zone change.

[5] The Board's motion also seeks authorization to operate an Early College Option program in collaboration with River Parishes Community College. This portion of the Board's motion has already been granted and is now moot. (Rec. Doc. 244, Order). The Early College Option program had no implications for the desegregation order(s) that remain in place in the parish.

LDF represented no plaintiff in the case, and given that it was not itself an aggrieved party with a claim or injury of its own to pursue, the Board had legitimately questioned who had authorized the LDF to move for relief in the name of the Harris plaintiffs from 61 years ago.[6] Without a "real" plaintiff with legal standing to pursue the relief being sought, to the extent that any aspect of the Motion for Further Relief, Discovery, and Evidentiary Hearing might not be moot, the Court had no choice but to deny the motion without prejudice. (*Id.* at 14). As the Court observed, desegregation cases do not present an exception to the requirement for legal standing, which goes to subject matter jurisdiction in federal court.[7] (*Id.* at 13).

## II.

The question before the Court is whether the Board can, consistent with its obligations under the extant desegregation order,[8] move forward to implement its plan to not only close the FWE school but to reassign its students to both LaPlace Elementary and East St. John Prep.

As long as a school district remains under the superintendence of a federal

---

[6] The LDF is a legal non-profit organization that provides legal representation to aggrieved parties. The LDF is not itself an aggrieved party with a claim or injury of its own to pursue so it has no legal authority or legal standing to pursue relief in its own name. It may only do so on behalf of an actual party and that party must have Article III standing to pursue the relief being sought.

[7] After the Board filed its opposition to the Motion for Further Relief, Discovery, and Evidentiary Hearing, which seized upon the doubts regarding standing that the Court had raised in its July 27, 2023 Minute Entry (Rec. Doc. 202), the LDF sought to put an actual plaintiff before the Court by filing a Motion to Substitute Named Plaintiffs (Rec. Doc. 228). But none of the persons who sought to join the lawsuit as plaintiffs had standing to prosecute the Motion for Further Relief, Discovery, and Evidentiary Hearing because none of the proposed plaintiffs had a particularized injury-in-fact attributable to the ongoing operation of the FWE school. (Order and Reasons at 16).

[8] For simplicity, from this point forward the Court will refer to the desegregation orders entered in Harris in the singular.

desegregation order, it has a duty "to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1453 (5th Cir. 1993) (citing *Freeman v. Pitts*, 112 S. Ct. 1430, 1443 (1992)). But federal court injunctive power "may be exercised only on the basis of a constitutional violation" so where racial imbalance is not traceable in a proximate way to constitutional violations a district court may decline to order further remedies in the area of student assignments. *Id.* at 1453-54. With the passage of time the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish. *Id.* at 1454 (citing *Freeman*, 112 S. Ct. at 1446). The school district must show that "a current imbalance is not traceable, in a proximate way, to the prior constitutional violation. *Id.* In the late phases of carrying out a decree, a school district need not employ awkward or inconvenient measures to achieve racially balanced school assignments when the imbalance is attributable neither to the prior de jure system nor to a later violation by the school district but rather to independent demographic forces. *Hull*, 1 F.3d at 1454 (citing *Freeman*, 112 S. Ct. at 1447).

    In *Hull v. Quitman County Board of Education*, the Fifth Circuit held that the same considerations applicable when deciding to terminate a desegregation order apply when determining whether a particular school board action comports with the goals of the decree. 1 F.3d at 1454. The panel in *Hull* reasoned that Supreme Court precedent had established a framework in which equitable decrees will not remain in effect perpetually and school districts can be returned to local control. *Id.* at 1454. Thus, good faith compliance, practicability of further desegregation, and local control are pertinent to determining whether a particular school board action, in a district subject to a

desegregation decree, sufficiently comports with the goals of the decree. *Id.* at 1454. The decision to close a school or to reassign students may not be used to perpetuate or reestablish the dual system. *Id.* (citing *Monteilh v. St. Landry Ph. Sch. Bd.*, 848 F.2d 625, 631 (5th Cir. 1988)). But there is no constitutional duty to achieve maximum desegregation or to achieve an ideal racial balance in the schools. *Id.* (citing *Monteilh*, 848 F.2d at 632). The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation. *Freeman*, 112 S. Ct. at 1447.

At the outset the Court must disabuse the Board of the notion that it was only necessary to file its motion for authorization "out of an abundance of caution." (Rec. Doc. 249, Reply at 2). The Board arrived at this notion based on the erroneous belief that in the absence of valid opposition to its motion—and the Board is persuaded that the LDF's opposition is not valid and need not be recognized by the Court—the Court could simply approve the Board's plan as being unopposed.

To be sure, the Court shares the Board's sentiments regarding the LDF's legal authority to file an opposition given that it does not represent any party in this case.[9] But whether the LDF's opposition is valid and must be recognized by the Court is immaterial because the Court cannot approve the Board's plan based solely on the lack of valid opposition. There has never been a judicial finding that the extant desegregation order should be dissolved so as to terminate court oversight of the school system in the

---

[9] Similar to the approach that it took when standing became an issue while the Motion for Further Relief, Discovery, and Evidentiary Hearing was pending, the LDF has filed a Motion to Substitute Named Plaintiffs (Rec. Doc. 246), which is scheduled for submission on May 14, 2025.

parish. Thus, even if no opposition to the Board's adopted plan had been raised, the Board cannot implement its plan without this Court's approval, and even in the absence of opposition, the Board must demonstrate to the Court that the plan does not run afoul of the extant desegregation order. Although it can be enlightening when a proposed action triggers no opposition, the existing desegregation order subjects the Board's actions to judicial scrutiny even in the absence of opposition. And even if the LDF has no legal right to oppose the Board's action, it does not follow that the Court must or should ignore any legitimate concerns with the Board's plan that the LDF brings to the Court's attention.

That said, two (of the three) concerns that the LDF has brought to the Court's attention are easily rejected. First, the LDF maintains that the Board has not shown that it considered its desegregation obligations in formulating its adopted plan. To the contrary, in its motion the Board did address the anticipated minor changes to the demographics of both LaPlace Elementary and East St. John Prep if its plan is implemented. (Memorandum in Support at 3). The Board has demonstrated that the proposed plan does not negatively impact desegregation. And there is certainly nothing to suggest that the reassignment plan in any way perpetuates or reestablishes the prior dual system that the desegregation order was entered to dismantle.[10] To the extent, that

---

[10] The Board's district-wide demographics are 74.6% Black, 9.1% White, and 16.3% Other. (Rec. Doc. 240-3, Fall 2024 Student Assignment Report). Under the Board's proposed plan, East St. John Prep would have a decrease in Black students to 81.2% (from 85%), an increase in White students to 6.6% (from 2.8%), and no change in Other students. LaPlace Elementary would have an increase in Black students to 76% (from 73.6%), a decrease in White students to 6.8% (from 8.6%), and a decrease in Other students to 17.2% (from 17.8%). As the Board points out, the slight changes in each school's demographic makeup put each school within +/- 10% of the district-wide average of Black students.

there might be any racial imbalance in the district as a result of the Board's adopted plan, there is nothing to suggest that it is attributable to the prior de jure system or to any later violation by the Board, and this is especially true given that the desegregation order dismantling the prior de jure system in the district was entered decades ago.

Second, the LDF raises a concern that the Board has not provided information regarding the proposed plan's impact on faculty and staff demographics.[11] As to staff reassignments, the Board points out in its reply that the district-wide faculty is 74.8% Black and 23.7% White, with only 1 White principal (who was assigned to FWE) and 1 White assistant principal in the entire school district. (Rec. Doc. 249, Reply at 5). Thus, given the demographics of the faculty and staff in the district, it is impossible to reassign FWE's staff in a manner that re-establishes the prior dual system or otherwise violates the desegregation order.

Of course the LDF's primary contention in opposition to the Board's plan is that while the Court should approve the Board's request to close FEW, it should deny the Board's request to reassign the FWE students between LaPlace Elementary and East St. John Prep. The LDF wants the attendance zone boundaries for LaPlace Elementary to be modified to incorporate the entire FWE attendance zone so that all FWE students will be reassigned to LaPlace Elementary and none to East St. John Prep.

Even though the Board currently operates a 5th-8th grade school at the East St. John Prep site, the continued operation of which is not in violation of the desegregation order, the LDF posits that East St. John Prep is not a healthy and safe environment for

---

[11] The Board did not address faculty and staff in its motion but it did so in its reply memorandum.

pre-K through 4th graders because of its proximity to the Denka plant.[12] While it is true that East St. John Prep is located farther from the Denka plant than the FWE school (FWE is located .5 miles from the plant; East St. John Prep is located 1.3 miles from the plant), the LDF maintains that the school's proximity to the Denka plant renders it an unequal and inferior facility. So reassigning any of FWE's students to East St. John Prep would violate the facilities equalization provisions of the operative desegregation order. The LDF's theory is that the Board's reassignment plan disproportionately assigns Black students to an inferior facility so the proposed reassignment plan is inconsistent with the Board's ongoing obligation to remedy the vestiges of the de jure era segregation in its facilities. The LDF contends that White children in the district have a much lower chance of attending a school where they would be at a high risk of chloroprene exposure.

    Recognizing that it need not disprove the LDF's contentions in order to have its plan adopted, the Board has retained no experts of its own to engage the LDF's experts regarding the potential dangers of chloroprene exposure. Where the LDF characterizes East St. John Prep as being "unsafe" and "unhealthy" due to its proximity to the Denka plant, the Board characterizes the concern as an "environmental issue," which was caused by a third-party long after the desegregation orders were entered in this litigation. While the Board certainly does not concede that East St. John Prep presents the health and safety concerns that the LDF raises, the Board's position is that its obligations under the extant desegregation order do not include remedying

---

[12] The Board has previously accused the LDF of harboring an ulterior motive to have East St. John Prep closed following the closure of FWE. (Order and Reasons at 5 n.4).

environmental issues caused by a third-party over which it has no control.

The Court is persuaded that the Board's proposed plan of closing FWE and reassigning its students between LaPlace Elementary and East St. John Prep is not violative of the extant desegregation order such that this Court should exercise its equitable powers to wrest local control of the school district from the Board. The Board was aware of the LDF's concerns regarding East St. John Prep when it considered and then approved the plan to assign a portion of FWE's PK-4th graders to the school. There has been no suggestion that the Board has not acted in good faith in formulating its plan to close FWE and reassign the student body, or that it has callously turned a blind eye toward a potential health hazard for young children of any race. Clearly the Board was not persuaded that East St. John Prep, where the district currently operates a school for 5th-8th graders, was unsafe or hazardous for younger students. The school site will not be rendered inferior or unequal by adding grades PK-4th at the school. The more cautious approach might very well have been for the Board to reassign all of FWE's students to LaPlace Elementary (or elsewhere), but the Board was not required to do so in order to remedy any vestiges of the de jure era in its facilities.

The Board's proposed modifications to the attendance zones for East St. John Prep and LaPlace Elementary School are based on simple geography with no indication of discriminatory line drawing. There is no indicia that the decision to assign a portion of FWE's PK-4th graders to East St. John Prep is being used to either perpetuate or reestablish the dual school system. The Court is not persuaded that the Board's reassignment plan would place it in violation of the extant desegregation order.

The LDF also complains that the Board's adopted plan conflicts with the

community's preference that all of FWE's students and teachers be reassigned to the same school. But this Court's approval of the proposed plan does not involve concerns about whether some community members simply prefer one plan over another. *Hull*, 1 F.3d at 1452 ("[The court] sits not to review the wisdom of a school board's actions, but their constitutionality."). This Court's sole concern is whether the proposed plan violates any aspect of the operative orders in this case, which the Court finds that it does not do.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Authorization to Close Fifth Ward Elementary and to Operate Early College Option Program (Rec. Doc. 241)** filed by the St. John the Baptist Parish School Board is **GRANTED** as prayed for.

May 9, 2025

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE